951 F.2d 1308
 139 L.R.R.M. (BNA) 2057, 293 U.S.App.D.C.
41, 60 USLW 2464,
120 Lab.Cas. P 11,040
 GENERAL INDUSTRIAL EMPLOYEES UNION, LOCAL 42, DISTILLERY,
RECTIFYING, WINE AND ALLIED WORKERS' INTERNATIONAL
UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Mohawk Liqueur Corporation, Intervenor.
 No. 91-1036.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 25, 1991.
Decided Dec. 27, 1991.
 
 Petition for Review of an Order of the National Labor Relations Board and Cross Application for Enforcement.
 Donald B. Greenspon, Detroit, Mich., for petitioner.
 William A. Baudler, Atty. N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, Washington, D.C., were on the brief, for respondent. Beverly Oyama, Atty. N.L.R.B., Washington, D.C., also entered an appearance for respondent.
 John S. Schauer, with whom Camille A. Olson, Chicago, Ill., was on the brief, for intervenor.
 Before SILBERMAN, D.H. GINSBURG and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 Mohawk Liqueur Corporation, in the midst of collective bargaining with Local 42 of the General Industrial Employees Union and shortly before the expiration of the existing contract, abruptly announced it would not pay the final cost of living adjustment (COLA) under that contract. The Union, in response, led the employees out on strike and filed an unfair labor practice (ULP) charge with the Board. Subsequently, Mohawk reversed its position and made the COLA payment. The Board held that Mohawk's withholding of the COLA was an unfair labor practice and that the ensuing strike was an unfair labor practice strike, but that after Mohawk relented, the strike converted into an economic strike. The Board therefore denied most of the relief sought by the Union, and the Union petitions for review. We affirm the Board and grant its cross-application for enforcement.
 
 I.
 
 2
 Mohawk and Local 42 began, in early May 1987, negotiations for a new collective bargaining agreement covering employees at the company's plant in Novi, Michigan. The old contract was to expire on May 31. The parties disagreed on many issues, but talks proceeded until, on May 29, Mohawk submitted its final offer. The offer provided, inter alia, that the company would not pay the old contract's final COLA, effective on May 31 (and due to be paid on June 4), which applied to hours worked during the preceding six months. The Union's chief negotiator, Vernon Frakes, told his counterparts that the refusal to pay the May 31 COLA was a "bombshell," an unfair labor practice that would cause the Union to strike. The talks broke down, and on June 1 the Union did go on strike. Mohawk unilaterally implemented its final offer the same day. June 4 passed without payment of the COLA, prompting the Union to file a grievance under the expired contract and also an unfair labor practice charge with the Board. Negotiations resumed in mid-July but stalled, largely because Mohawk continued to insist that it would not pay the COLA.
 
 
 3
 On July 28, Mohawk acquiesced and issued the overdue COLA checks to the striking employees, stating in a cover letter that although the company's action had been "proper," the COLA was "no longer an issue in negotiations." The strikers were accordingly warned that they would be permanently replaced if they did not return to work by August 4. With the COLA checks in hand and the replacement deadline looming, the Union met on August 3 to decide whether to continue the strike. In the Board's view, the course of this meeting was decisive. Frakes told the Union members that it would be a "problem" if they continued the strike despite the company's payment of the COLA. He and the Union's attorney explained that the Board might well consider the strike, if continued, to be an economic one. The company's unilateral implementation of its final offer was not a topic of discussion at all, presumably because those terms currently applied only to strike replacements and those original employees who crossed the picket lines.
 
 
 4
 The meeting focused, instead, on Mohawk's refusal--thought by the Union to be unlawful--to disclose the names of certain strikers whom the company was considering discharging for strike misconduct. In the end, the Union decided to postpone voting on the company's final offer and to remain on strike at least until the next negotiating session on August 11, in hopes of obtaining the desired information as well as amnesty for any misconduct and inclusion of COLAs and other favorable terms in the new contract.
 
 
 5
 Mohawk permanently replaced the strikers when none of them returned to work on August 4. At the August 11 meeting, Mohawk held firm against amnesty or changing its final offer, but did agree to provide the information on potential discharges. The May 31 COLA was no longer a relevant issue; as Frakes later testified, by this time the issue had been "settled." Indeed, the Union announced that it was withdrawing its COLA grievance. The strikers met again on August 12 and voted to return to work without a contract because their reasons for refusing to work--Mohawk's nonpayment of the COLA and refusal to provide the discharge information--had been "fulfilled" (and because a decertification petition was circling among the cross-over and replacement employees at the plant). Mohawk soon reinstated some, though not all, of the strikers, and the dispute finally ended in January 1988, when Mohawk and Local 42 executed a new contract incorporating the company's final offer.
 
 
 6
 The Board, adopting most of the findings and conclusions of the Administrative Law Judge (ALJ), held that Mohawk's refusal to pay the May 31 COLA under the old contract, insistence to impasse that the Union bargain about that COLA, and unilateral implementation of the final offer on June 1 before reaching a lawful impasse constituted bad faith bargaining in violation of sections 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) & (5). It also determined that Mohawk's unlawful refusal to pay the COLA was a contributing cause of the strike, making it an unfair labor practice strike. The Board concluded, however, that after the COLA was paid and the Union met on August 3, the strike continued for entirely economic reasons, and that Mohawk was thereafter entitled to implement its final offer and to hire permanent replacements. As a remedy for the violations found, the Board issued a standard order to cease and desist and to post notices and also ordered Mohawk to pay interest to the employees for the delay in issuing the May 31 COLA checks. See Mohawk Liqueur Co., 300 N.L.R.B. No. 146 (Dec. 31, 1990).
 
 II.
 
 7
 Strikes by employees covered by the NLRA are either economic or unfair labor practice strikes. Employees who take part in the former run the risk of permanent replacement by new hires. But unfair labor practice strikers are entitled to reinstatement if they wish to return to work and, if denied reemployment, are also entitled to back pay from the date of denial. See NLRB v. International Van Lines, 409 U.S. 48, 50-51, 93 S.Ct. 74, 76, 34 L.Ed.2d 201 (1972); International Union of Elec., Radio & Mach. Workers v. NLRB, 604 F.2d 689, 697-98 (D.C.Cir.1979).
 
 
 8
 The character of a strike depends on its cause. Under longstanding Board precedent, a work stoppage is an unfair labor practice strike only if the employer's violations of the labor laws are a "contributing cause" of the strike. See, e.g., Teamsters Local Union No. 515 v. NLRB, 906 F.2d 719, 723 (D.C.Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 767, 112 L.Ed.2d 786 (1991); Typoservice Corp., 203 N.L.R.B. 1180, 1180 (1973).
 
 
 9
 The causes of a strike can, of course, change over time. Sometimes a strike that starts for economic reasons is prolonged by the employer's subsequent unlawful conduct and is thereby "converted" from an economic to an unfair labor practice strike. See Allied Indus. Workers, AFL-CIO Local Union No. 289 v. NLRB, 476 F.2d 868, 882-83 (D.C.Cir.1973); see also Facet Enters., Inc. v. NLRB, 907 F.2d 963, 976-77 (10th Cir.1990). Similarly (although there are fewer examples), an unfair labor practice strike can be converted to an economic strike if the illegal acts that originally caused the dispute fade in significance and the employees continue the strike solely to enforce their economic demands on the employer. See, e.g., Studio 44, Inc., 284 N.L.R.B. 597, 600-02 (1987); Trident Seafoods Corp., 244 N.L.R.B. 566, 569-70 (1979), enf'd, 642 F.2d 1148 (9th Cir.1981).
 
 
 10
 The Board has consistently held that "[t]he requirement of a causal connection is not satisfied merely because [an unfair labor practice and a strike] coincide in time." Tufts Bros. Inc., 235 N.L.R.B. 808, 810 (1978) (citing Typoservice Corp., 203 N.L.R.B. 1180 (1973)); see also C-Line Express, 292 N.L.R.B. 638, 638 (1989) ("[A]n employer's unfair labor practices during an economic strike do not ipso facto convert it into an unfair labor practice strike."); John Cuneo, Inc., 253 N.L.R.B. 1025, 1026 (1981), enf'd sub nom. Road Sprinkler Fitters Local Union No. 669 v. NLRB, 681 F.2d 11 (D.C.Cir.1982), cert. denied, 459 U.S. 1178 (1983). The Board instead examines objective and subjective indicia of the strikers' actual motivation in a particular case. See, e.g., C-Line Express, 292 N.L.R.B. at 638 (citing Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1080 (1st Cir.1981)). The Board's findings regarding the causes of a strike are factual, and we must uphold them if they are supported by substantial evidence in the record as a whole. See 29 U.S.C. § 160(e); Facet Enterprises, 907 F.2d at 976; Allied Indus. Workers, 476 F.2d at 883.
 
 
 11
 Petitioner's principal argument is that Mohawk's unlawful practices had not been fully "cured" as of August 3, 1987, and therefore the Board erred "as a matter of law" in deciding that the strike converted from an unfair labor practice strike to an economic strike on that date. The Board, as we noted, did find that Mohawk's refusal to pay the May 31 COLA constituted an unfair labor practice and that this ULP was a principal cause of the walkout on June 1. And it also found that the company's effort to cure its unfair labor practice--its belated payment of the COLA, without interest and without any acknowledgement of wrongdoing--failed to satisfy the stringent criteria for effective repudiation of unlawful conduct established in Passavant Memorial Area Hospital, 237 N.L.R.B. 138, 138-39 (1978).[1]
 
 
 12
 The difficulty with petitioner's argument, however, is that there is no necessary connection between the legal standard the Board uses under Passavant to determine whether a party has "cured" its unfair labor practice so entirely that no further Board proceedings are appropriate, and a decision made by employees that their employer's action (which constituted an unfair labor practice) has been sufficiently modified or revoked as no longer to constitute a reason to strike. It may well not be worth striking to achieve the last full remedial measure on which the Board will, as a matter of policy, insist. The question then, as the Board properly saw it, was not whether Mohawk's grudging payment of the COLA was a complete cure of its unfair labor practice--it was not--but whether it removed the unlawful practice as a cause of the strike.[2]
 
 
 13
 To be sure, if an unfair labor practice is not fully cured, it may be, depending on the employees' motivation, a continuing cause of a strike. See, e.g., Chicago Beef Co., 298 N.L.R.B. No. 156, slip op. at 6 (June 29, 1990) (holding that a ULP strike did not convert because the employer's efforts at repudiation "did not cure the unfair labor practice or otherwise remove it as a factor in prolonging the strike" (emphasis added)), enf'd, 944 F.2d 905 (6th Cir.1991) (table); Trumball Memorial Hosp., 288 N.L.R.B. 1429, 1429 (1988). Indeed, in one case in which the Board found that a labor law violation was a cause of a strike and that the employer's efforts to cure the violation were entirely ineffective, the Board appears simply to have assumed that the violation retained its causative force. See Gloversville Embossing Corp., 297 N.L.R.B. No. 21 (Oct. 30, 1989).
 
 
 14
 But the Board has never held, as a matter of law, that the contemporaneous existence of an incompletely cured unfair labor practice and a strike requires a determination that the two are causally connected. The Board has instead decided on several occasions that an unlawful practice not fully cured under Passavant nevertheless was not, or had ceased to be, a reason underlying a strike. See, e.g., Concord Metal, Inc., 295 N.L.R.B. No. 94, slip op. at 6-7 (June 30, 1989) (finding that an employer had not adequately cured its unfair labor practice but still remanding to the ALJ to determine whether that practice caused the strike), after remand, 298 N.L.R.B. No. 167, slip op. at 1 n. 1 (July 11, 1990) (adopting ALJ's finding that the strike was not caused by the uncured ULPs); Studio 44, 284 N.L.R.B. at 601 & n. 23 (holding that a ULP strike converted to an economic strike when the employer "substantially" corrected its unlawful practice even though the correction "obviously ... did not constitute a 'cure' so as to obviate the instant proceeding and remedy"); Trident Seafoods, 244 N.L.R.B. at 569-70 (holding that a ULP strike converted after a repudiation that clearly did not satisfy the Passavant criteria). These decisions are analytically consistent with the Board's settled position, discussed above, that a strike's coexistence in time with even an unfair labor practice that the wrongdoer has made no effort to repudiate does not ineluctably lead to a determination that the unlawful practice is a contributing cause of the strike. And therefore we do not see how the Board's general reasoning is subject to challenge.
 
 
 15
 There remains the question whether the Board's factual determination of causation--which turns on the Board's understanding of what transpired at the August 3 Union meeting--is vulnerable. We think not. It is amply supported by record evidence. The meeting's avowed purpose was to decide whether to prolong the strike. The minutes of the meeting, the motion by which the strikers decided not to return to work, and the testimony before the ALJ all demonstrate that the reasons for continuing the strike had nothing whatsoever to do with Mohawk's prior violations of the NLRA. Rather, the record indicates that the strikers wished to obtain information on discharges, amnesty for strike misconduct, and COLAs in the new contract. (The Union believed at the time of the August 3 meeting that Mohawk's failure to provide the discharge information was itself an unfair labor practice, but the ALJ decided that Mohawk's conduct in that regard was lawful, a decision that was not challenged before the Board.) The May 31 COLA came into the deliberations only when the Union negotiator and attorney explained why it was no longer a reason to strike. No striker expressed disgruntlement with Mohawk's unilateral imposition of its final offer (which at the time mainly affected the employees working in place of the strikers).[3] And no one complained that Mohawk had not included interest in the belated COLA checks or had otherwise failed to cure its prior misdeeds completely. The evidence relating to both the August 11 negotiating session (such as Frakes' testimony that the parties agreed the COLA issue had been "settled" and the Union's announcement that it was withdrawing its COLA grievance) and the August 12 Union meeting also supports the Board's conclusion that the strike was prolonged for reasons entirely unrelated to Mohawk's unfair labor practices.
 
 III.
 
 16
 The Union also challenges the Board's determination that Mohawk lawfully discharged employee Mary Louise Witmer for picket line violence because she threw stones at and damaged a job applicant's automobile. The ALJ's decision to credit testimony identifying Witmer as the stone-thrower was clearly based on substantial evidence, so the only question is whether Witmer's " 'misconduct ... under the circumstances ... reasonably tend[ed] to coerce or intimidate employees' " at the Mohawk plant in the exercise of their protected rights. Clear Pine Moldings, Inc., 268 N.L.R.B. 1044, 1046 (1984) (quoting NLRB v. W.C. McQuaide, Inc., 552 F.2d 519, 527, 528 (3d Cir.1977)), enf'd mem., 765 F.2d 148 (9th Cir.1985), cert. denied, 474 U.S. 1105, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986). The ALJ appears to have applied this objective test improperly, looking to the subjective reactions of specific employees, but the Board recognized the error and applied the test correctly, holding that "such stone throwing ... would reasonably tend to intimidate employees." The Board's decision was reasonable and conforms with its precedent. "The Board and the courts have consistently held that throwing objects at moving vehicles constitutes serious strike misconduct for which employees may [lawfully] be discharged." General Teamsters Local No. 162 v. NLRB, 782 F.2d 839, 843 (9th Cir.1986).[4]
 
 
 17
 * * * * * *
 
 
 18
 Accordingly, the petition for review is denied and the
 
 
 19
 Board's cross-application for enforcement is granted.
 
 
 20
 So ordered.
 
 
 
 [1]
 Passavant requires the repudiation to be timely, unambiguous, specific in nature to the coercive conduct, free from other proscribed conduct, adequately published to the employees involved, accompanied by assurances that the employer will not interfere with the employees' section 7 rights in the future, and not followed by any additional illegal conduct. See 237 N.L.R.B. at 138-39
 
 
 [2]
 The Union also argues that the remedy the Board ordered is insufficient because it failed to make employees "whole" for the difference in pay and benefits between the old contract and the final offer that Mohawk unlawfully implemented on June 1. The Union's brief focuses on the relief due the strikers who returned to work on August 17, but the Board was justified in determining that the parties were at a purely economic impasse after the August 3 meeting and therefore that Mohawk's implementation of its final offer after that date was lawful and no relief was due this group of strikers. In a footnote, the Union also requests a make-whole remedy for the replacement employees and cross-overs who worked between June 1 and August 3. The Union's counsel conceded at oral argument, however, that no party filed a specific exception to the ALJ's failure to provide this relief. We lack jurisdiction to address such unpreserved contentions. See 29 U.S.C. § 160(e); Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665-66, 102 S.Ct. 2071, 2082-83, 72 L.Ed.2d 398 (1982)
 
 
 [3]
 Petitioner's counsel conceded at oral argument that nothing in the record specifically indicates that the Union continued the strike after August 3 to protest Mohawk's earlier unlawful implementation of the final offer
 
 
 [4]
 We have considered the Union's other arguments and find them to be without merit