Kelly MERK, et al.,
Plaintiffs–Appellees,

v.

JEWEL COMPANIES, INC.,
Defendant–Appellant,

and

United Food and Commercial Workers
International Union, AFL–CIO, Local
881, Defendant–Appellee.

No. 86–2723.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1987.

Decided May 31, 1988.

Rehearing and Rehearing En Banc
Denied June 27, 1988.

Terrill E. Pierce, Kovar Nelson & Brittain, Chicago, Ill., for defendant-appellant.

Neal D. Rosenfeld, Karmel & Rosenfeld, Chicago, Ill., William J. Cremer, Tressler, Soderstrom Maloney & Priess, Wheaton, Ill., for plaintiffs-appellees.

Before FLAUM, EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

Jewel Companies, which operates a chain of supermarkets, reached a collective bargaining agreement with Local 881 of the United Food and Commercial Workers Union in September 1982. The agreement ran until June 1985. In December 1983 Jewel asked the Union to agree to a reduction in wages and benefits notwithstanding the agreement. The Union refused. Jewel declared in February 1984 that an "impasse" had been reached and put its most recent proposal into effect. The result was a reduction of up to $1.25 per hour for about 18,000 employees.

Jewel claimed that it was entitled to reduce the hourly wage, notwithstanding the collective bargaining agreement, because it had an oral understanding with the Union that the question of wages would be reopened when a rival discount chain went into operation, which happened in the fall

of 1983. The Union denied that it had made such a pledge and added that in its view an oral promise could not prevail over the written agreement. Its members overwhelmingly rejected a proposal to ratify the wage reductions. The Union invoked the arbitration clause of the agreement and asked the General Counsel of the National Labor Relations Board to issue a complaint charging Jewel with unfair labor practices. After Jewel refused to arbitrate the Union filed suit, and a district judge ordered Jewel to do so. The General Counsel eventually issued a complaint. Jewel was under the gun in two forums at once.

By then the collective bargaining agreement was nearing an end. Jewel and the Union tried to settle their dispute and reach a new agreement as a package. After hard bargaining they did so. Jewel agreed to restore most wages and benefits to the level provided in the 1982 agreement, retroactive to February 1984.[1] In June 1985 the Union's members ratified this agreement, roughly 80% voting in favor. The Union withdrew its request for arbitration, and at the joint request of Jewel and the Union the General Counsel dismissed the unfair labor practice charge. That dismissal is not reviewable. *NLRB v. United Food & Commercial Workers Union,* —— U.S. ——, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987).

There was a catch. Only persons still employed on June 21, 1985, received back pay. Jewel takes the June 1985 agreement as a comprehensive settlement, extinguishing any rights of the 2,000 or so who retired, quit, or were fired between February 1984 and June 1985. The Union believes that the 1985 agreement, which is silent on the treatment of these employees,

leave them to whatever devices they have under the 1982 agreement. In either case, Jewel was not making haste to give them cash, and the arbitration—which was within the Union's control—no longer offered them any prospects. Several of these former workers protested to the Labor Board's General Counsel, who ratified her decision to dismiss the complaint. They then filed this class action against Jewel and the Union, urging alternatively a breach of contract, reparable under § 301 of the Labor–Management Relations Act, 29 U.S.C. § 185, and a breach of the Union's duty of fair representation.

The district court granted summary judgment for the Union, concluding that it had no duty to represent—fairly or otherwise—persons no longer employed by Jewel at the time of the new contract. 641 F.Supp. 1024, 1027–32 (N.D.Ill.1986). It could not breach a duty it did not owe. The tag-along "hybrid" contract/duty of fair representation claim against Jewel had to be dismissed as well. But the "straight" contract claim under § 301 might have substance, the court thought, because Jewel paid the former employees less than the agreement specified. The Union, which was no longer the representative of the ex-employees, could not compromise their claims. The district court therefore denied Jewel's motion for summary judgment. It certified two questions under 28 U.S.C. § 1292(b), and we accepted Jewel's interlocutory appeal.[2]

In this court, as in the district court, the parties assume that unless the Union fairly represented the former employees, Jewel's motion for summary judgment was proper-

1. The parties disagree about how close to full restoration and back pay this came. The dispute is not important for current purposes.

2. Jewel also contended that the suit is barred by the statute of limitations. The district court disagreed, 641 F.Supp. at 1032–37. Shortly after the district court's decision, we held in *International Union of Elevator Constructors v. Home Elevator Co.,* 798 F.2d 222 (7th Cir.1986), that "straight" § 301 actions to enforce collective bargaining agreements would continue to be governed by the most analogous state statute of limitations, usually the period for breach of contract. The district court concluded that the

most analogous period is given by Ill.Rev.Stat. ch. 110 ¶ 13–205, providing five years to sue on an oral contract. Whether five years or some other period is best, any period longer than 20 months is long enough to make this suit timely (it was filed in September 1985, and the claim arose no earlier than February 1984), and as Jewel does not suggest any period shorter than five years—other than the 90–day period for seeking arbitration and the six-month period now used for "hybrid" actions, both of which we rejected in *Home Elevator,* we agree with the district court that this suit is timely.

ly denied. Jewel contends that the Union represented all of its present and former employees; the Union denies that it owed any duty to the former employees (but insists that, if it did, it represented them fairly); the plaintiffs maintain that the Union did not represent them (and that it sold them down the river, showing that any representation was inadequate). The district court concluded that the Union faced a hopeless conflict of interest. The former employees, no longer members of the bargaining unit, could not vote against any compromise, so that the officers of the Union had nothing to lose and everything to gain by giving away the ex-employees' rights in exchange for larger payments for current employees. The court concluded that the Union did not have, and if it had did not discharge, a duty to represent the former employees fairly.

■ We have some doubt whether this is the right way to approach the question. Perhaps if the Union did not represent the ex-employees, that simply left them to the mercy of Jewel. The entitlements established by collective bargaining agreements do not survive their expiration or modification. So if, for example, the 1982–85 agreement had established a plan under which Jewel provided health benefits for its employees and retirees, the Union and Jewel would have been free to abolish those benefits for subsequent periods, even though the Union does not represent retirees. If the Union and Jewel had reached an impasse, Jewel would have been free to put into place its last proposal, which might not have included health benefits. *Anderson v. Alpha Portland Industries, Inc.,* 836 F.2d 1512 (8th Cir.1988); *Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311 (7th Cir.1986); cf. *DeGeare v. Alpha Portland Industries, Inc.,* 837 F.2d 812 (8th Cir.1988) (ERISA does not alter the rule of labor law in this respect). That the retirees had worked in earlier years in the expectation that they were receiving money today and health benefits later would not matter. Because of the time limit on the collective bargaining agreement, any subjective expectation they may have had is not enforceable. And the Union, which

under *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), does not necessarily represent retired workers, may choose to negoitate an agreement that provides more for today's workers and less for retirees. This becomes effective against retirees on the employer's say-so; the lack of representation does not give the retirees rights greater than those provided in collective bargaining agreements. Perhaps Jewel and the Union could undo the expectations of ex-workers about wages, just as they could frustrate their expectations about health benefits and other deferred compensation (to the extent ERISA does not cause these rights to vest). The collective bargaining agreement, after all, is between the Union and the employer, not between the workers (with union as agent) and the employer. On this view the union and employer may modify "their" agreement and let the chips fall where they may. Perhaps too Jewel can be seen as having invoked in February 1984 a modification clause (albeit unwritten) of the collective bargaining agreement, just as it says, after which everyone got the contracted-for wage between February 1984 and June 1985; when in June 1985 the Union negotiated "back pay" this was in the nature of a bonus for existing employees (in lieu of higher future wages) rather than reparations for an established wrong. The Union had no duty to any former employee in June 1985, so these persons cannot complain that the Union did not get them a "signing bonus" too: they did not sign and did not agree to reduce their future wages in exchange.

This is not necessarily the right way to look at the subject, however. The former employees do not contend that the terms of the 1982–85 collective bargaining agreement survived its expiration. They simply want the terms honored during the years they were in force, when, they contend, they were third party beneficiaries. Once they left Jewel's employ, as they see things, the Union lost any control over their fate. Had the Union agreed in June 1985 that its existing members would re-

ceive no back pay, the plaintiffs believe that this would not have affected their claims, which "vested" (the plaintiffs say) hour-by-hour as they worked between February 1984 and their last day at Jewel. This could create a bargaining nightmare, because no one could represent all of the former employees, and Jewel could not settle their claims even if it treated them exactly as it treated those who continued to work. It is not, however, such a fanciful position that we can reject it out of hand. Because the district court proceeded on the assumption that Jewel could not change the terms unilaterally once the 1982–85 agreement expired, and the parties have not briefed this question,[3] we resolve the case on the terms on which it was presented.

The district court asked the question: Is the Union the representative of the ex-employees, capable of compromising (here, extinguishing) their contractual rights? It answered "no" for two reasons: the former employees are not "employees" under § 2(3) of the National Labor Relations Act, 29 U.S.C. § 152(3), so that the Union is not their statutory representative; and in any case the Union faced such a conflict of interest that it could not fulfill its implied duty of "fair representation", see *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed. 2d 842 (1967), and again is forbidden to compromise their claims. We start with the second point.

■ Conflicts among members of a union are inevitable and do not prevent a union from representing all employees in the bargaining unit. "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). See also *Humphrey v. Moore*, 375 U.S. 335, 349–50, 84 S.Ct.

363, 371–72, 11 L.Ed.2d 370 (1964). Older employees may want the union to obtain seniority systems and hefty pension plans, while younger employees may prefer wage scales linked to productivity and may want cash now rather than pensions later. As *Pittsburgh Plate Glass* demonstrates, unions face a conflict between benefits for active workers and benefits for the retired. Members will disagree about how to meld seniority lists in the event of a merger; some will prefer endtailing, some dovetailing. See *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793 (7th Cir.1976). Current members may like their high pay, while employers may want to reduce the average wage; union and employer therefore may agree that employees hired in the future (who by definition are not yet members of the bargaining unit) will receive lower pay. A two-tier wage structure poses many of the same problems as the two-tier settlement in this case. The list of potential conflicts can be extended indefinitely. Unions resolve these in bargaining, and they are not disqualified from representing members of the bargaining unit just because some members will benefit at the expense of others. There may be no satisfactory way to resolve the conflicts even in principle. See Mayer G. Freed, Daniel D. Polsby & Matthew L. Spitzer, *Unions, Fairness, and the Conundrums of Collective Choice*, 56 S.Cal.L.Rev. 461 (1983). Congress has required unions to deal with conflicts by *considering* the interests of each group (the duty of fair representation) and by conducting internal operations in a democratic fashion. These statutory guarantees, coupled with the pressure the incumbent union faces from others seeking to organize the employees (or from the threat of decertification and non-union operation), induce unions to make reasoned choices. They will not be perfect, but they are apt to be good. See Comment, *The Union Judgment Rule*, 45 U.Chi.L.Rev. 980 (1987) (discussing the different sources of marketplace pressure leading unions to represent their many constituencies fairly well).

---

**3.** Except for an allusion in note 1 of Jewel's   reply brief, which is too little, too late.

Sometimes the success of these devices—whether internal union politics or the threat of replacement by a new and better union—will be apparent. Suppose the Union, desirous of preserving a reputation for effective representation (in order to attract new members), had insisted that Jewel treat equally all who worked between February 1984 and June 1985, whether or not they were still on Jewel's payroll. Equal treatment would suggest that the Union had represented past employees fairly in relation to its current members.[4] So it is not impossible to imagine the Union adequately representing former employees, any more than it is impossible to imagine a union representing retirees vigorously. Every union knows that its members eventually become ex-employees as they retire or change jobs. Some will remain in the industry (and stay as members); the Union wants to keep them happy; many of the 2,000 former employees of Jewel must still work in supermarkets. Even those who plan to leave both industry and union (by retirement or a change in line of work) want the union to look after their interests when they go, and they treat ex-employees well today so that they may be treated well tomorrow. The employer, too, has an interest in just treatment of former employees, for it wants to attract new labor and has a reputation to protect. It will look after former employees' interests, to an extent, in bargaining. Cf. Daniel R. Fischel, *Labor Markets and Labor Law Compared with Capital Markets and Corporate Law*, 51 U.Chi.L.Rev. 1061 (1984). The potential for conflict among groups of employees therefore does not mean that a union is forbidden to attempt to broker the interests of the different groups. If it did, the idea of "exclusive representation", a bedrock principle of the NLRA, would quickly be lost. *Steele*, the first of the "fair representation" cases, concluded that only "hostile discrimination" (323 U.S. at 202–03) among members in negotiating a collective bargaining agreement violated the duty. See also *Flight Officers v. United Air Lines*, 756 F.2d 1274, 1281 (7th Cir.1985). Certainly many a conflict arises, and is resolved, without such discrimination. Cf. James D. Holzhauer, *The Contractual Duty of Competent Representation*, 63 Chi.—Kent L.Rev. 255 (1987).

Our case involves more than the run-of-mine conflict among workers, however. It involves a conflict between current and former workers. Under § 2(3) of the NLRA, 29 U.S.C. § 152(3),

> The term "employee" shall include any employee ... and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any ... individual employed as a supervisor....

Although the statute does not in terms exclude workers who have retired, quit, or been fired, the parties have followed the implication of *Pittsburgh Plate Glass* in treating § 2(3) as if it did. Jewel's former employees therefore lost their status as NLRA "employees" when they left work for reasons other than a labor dispute or unfair labor practice. Although failure to implement the terms of a collective bargaining agreement may be an unfair labor practice if it is an end run around the bargaining process, *Westinghouse Electric Corp. v. NLRB*, 809 F.2d 419 (7th Cir.1987); *Fall River Savings Bank*, 260 N.L.R.B. 911 (1982), so that those who quit in protest (like those fired in violation of the agreement) remain "employees", neither Jewel nor the Union has contended that any substantial portion of the 2,000 quit for this reason. Unions represent ex-employees all the time when trying to obtain their reinstatement under an agreement, or when pressing other claims connected with their departures. The Union did not treat these 2,000 former workers as "employees" for the purpose of voting on the new pact in

---

**4.** "Suggest" rather than "prove", because the Union might accept a low settlement (say, 10¢ on the dollar for all) in order to get higher wages and benefits in the next contract; these future wages would accrue entirely to the existing work force, just as the payment of back wages under the actual agreement did.

June 1985, however, and Jewel did not treat them as employees for any purpose. Again we follow the parties' lead in assuming that the 2,000 former workers are not statutory "employees"—without deciding whether this question would have had a different answer had the parties chosen a different litigating strategy.

█ A union need not represent non-employees. *Pittsburgh Plate Glass* establishes this.[5] Representation is not forbidden, however; § 2(3) excludes supervisors from the status of "employee", but unions may represent supervisors with their, and the employer's, acquiescence. 29 U.S.C. § 164(a); *Florida Power & Light Co. v. Electrical Workers*, 417 U.S. 790, 812–13, 94 S.Ct. 2737, 2748, 41 L.Ed.2d 477 (1974). Cf. *NLRB v. Electrical Workers*, —— U.S. ——, 107 S.Ct. 2002, 95 L.Ed.2d 557 (1987); *NLRB v. Hendricks County Rural Electrical Membership Corp.*, 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981). So too unions may bargain on behalf of retirees if the employer is willing, although the retirees need not accept the offer of representation. *Pittsburgh Plate Glass*, 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20; *United Automobile Workers v. Yard-Man, Inc.*, 716 F.2d 1476, 1484 (6th Cir. 1983). Former employees might choose the union as their agent for purposes of implementing or compromising claims arising under a collective bargaining agreement. It is even possible that employees may assent through the agreement itself to make the union their agent to resolve all disputes arising out of the implementation of that agreement—disputes that by definition arise during the employment relation—even if they leave work before its end. Such a consent would enable the union and the employer to administer the agreement without the complications caused by a proliferation of parties as employees quit or leave. Perhaps consent of this sort should be implied from the presence of an arbitration clause, which appears to put the Union in charge of handling claims of current and former employees. Persons represented by a union and covered by a collective bargaining agreement—even those no longer working—must exhaust union remedies before filing suit under § 301, see *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), which may imply that the union always administers the collective bargaining agreement even for those no longer classified as statutory "employees". Cf. David E. Feller, *A General Theory of the Collective Bargaining Agreement*, 61 Cal.L.Rev. 663, 774, 792, 811 (1973) (contending that collective bargaining agreements necessarily exclude the possibility of individual enforcement rights). Again, however, the parties have not discussed whether the former employees assented to representation by the Union—in the collective bargaining agreement itself or by acquiescing in the Union's pursuit of their rights through arbitration—or have exhausted their internal remedies. We do not speculate on the implications of such an approach for future litigation.

Having excluded other ways of looking at things, we are left with the district court's: that because the 2,000 former workers are not statutory "employees", the Union does not represent them. The Union owes no duty to those it does not represent. If it does not have a duty to represent them at all, it does not have a duty to represent them "fairly". The Supreme Court implied that duty from the statutory rule of exclusive representation. See *Steele* and *Vaca*. If the ex-workers are free to cut their own deals with Jewel, but let the Union bargain for them instead, then the Union's duty is fixed by the terms of any agreement creating these bargaining rights. The ex-employees' ability to shop for agents, to pit the union against members of the bar for the right to represent them on the claims,

---

5. The union may not, however, deliberately injure (on forbidden grounds) even those whom it does not represent in bargaining. *Brotherhood of R.R. Trainmen v. Howard*, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed.2d 1283 (1952). The extent to which such wrongful conduct may support a finding of unfair labor practices is canvassed in Bernard D. Meltzer & Stanley D. Henderson, **Labor Law** 1133–45 (3d ed. 1985). The Board has held lawful under the NLRA a settlement that favored existing employees over departed ones, *Steelworkers Local No. 2869*, 239 N.L.R.B. 982 (1978), but this does not resolve the question before us.

removes the foundation for implication of a "duty of fair representation". It leaves the plaintiffs in control of their own fate. And they have not compromised with Jewel their claims arising out of the 1982–85 agreement.

This is an unsettling conclusion, because it frustrates the ability of union and employer to resolve existing disputes. See *Republic Steel Corp.*, 379 U.S. at 653, 85 S.Ct. at 616. Holdouts among the former employees may leave the dispute as a festering sore, undermining labor peace. Inability to reach a global settlement does not necessarily favor either employer or (ex-) employee; a settlement under a union's auspices presumably would reflect the chances of prevailing before an arbitrator or in court under a § 301 suit, and former employees representing themselves may either settle on similar terms or press on to litigation, where they will win or lose but on average expect to get the same sort of deal that was reached in bargaining. The proliferation of persons with authority to bargain on their own will raise the cost of bringing the dispute to a conclusion, however, and the prospect of some ex-employees' suing and winning may make a union leery of compromising the claims of the current employees. The compromise will look bad in retrospect if ex-employees get 100¢ on the dollar. The net effect may be to delay settlement of disputes and increase the risk borne by workers and employers alike.

Nonetheless, the parties' failure to make arguments that might have avoided this consequence leaves us with little choice. If the Union did not represent the plaintiffs *at all* in June 1985, then it is hard to see how it could have surrendered their claims. One of the Union's officers testified in a deposition that he perceived a conflict between current and former members of the bargaining unit and "absolutely" favored the active members. The plaintiffs were not part of the bargaining unit

6. Jewel observes that the package deal settling the old dispute and adopting a new collective bargaining agreement passed by such a large margin that it would have been adopted had all 2,000 former employees appeared and voted

and were not notified of the settlement or offered an opportunity to vote on it.[6] The former employees did not receive any form of vicarious representation—that is, they did not get the same terms as those still employed on June 21, 1985. On the assumption, shared by all in the district court, that the "duty of fair representation" and the power to compromise the ex-employees' claims are necessarily linked, we hold that the Union did not have (and if it had did not fulfill) such a duty toward the plaintiffs in June 1985. The district court now must decide whether Jewel's unilateral reduction of wages and benefits in February 1984 violated the collective bargaining agreement.

AFFIRMED.

"no". That may well be, but the former employees were excluded from the deliberations as well as from the voting, and we do not lightly assume that arguments made at union meetings are irrelevant to the members' decisions.