951 F.2d 806
 139 L.R.R.M. (BNA) 2246, 60 USLW 2464,
120 Lab.Cas. P 11,117,
14 Employee Benefits Cas. 2238
 Norman SENN, Clemens Kien, Paul Gilmore, et al., Plaintiffs-Appellees,
v.
UNITED DOMINION INDUSTRIES, INCORPORATED, formerly known as
AMCA International Corporation, PST, Incorporated
and Pressed Steel Tank Company,
Incorporated, Defendants-Appellants.
 No. 90-3100.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 10, 1991.
Decided Jan. 8, 1992.
 
 Miriam R. Katzman, Zubrensky, Padden, Graf & Maloney, Milwaukee, Wis., William T. Payne (argued), Schwartz, Steinsapir, Dohrmann & Sommers, Los Angeles, Cal., George Graf, Gillick, Murphy, Wicht & Prachthauser, Brookfield, Wis., for plaintiffs-appellees.
 Kirk D. Messmer, Allan Gunn, Jay G. Swardenski (argued), Matkov, Salzman, Madoff & Gunn, Chicago, Ill., for defendants-appellants.
 Before BAUER, Chief Judge, COFFEY, Circuit Judge, and WILL, Senior District Judge.*
 COFFEY, Circuit Judge.
 
 
 1
 United Dominion Industries, Inc., its subsidiary PST, Inc. ("PST"), and Pressed Steel Tank Co., Inc. ("New Pressed Steel"), the corporation which purchased the assets of PST in January 1987, appeal from the district court's permanent injunction of September 10, 1990. The injunction required the defendants to furnish lifetime health and life insurance benefits to retired PST hourly employees who worked for PST after November 1975, as well as their spouses and eligible dependents. The district court's injunction ordered that the defendants pay the full premium cost for coverage, except for the cost difference between conventional health insurance coverage and HMO coverage for persons who retired after August 1986. The order accompanying the injunction remanded the suit to the magistrate for determination of past damages that retired employees incurred as a result of the defendants' refusal to provide the benefits. We reverse.
 
 I. FACTUAL BACKGROUND
 
 2
 This case concerns the obligations of the defendants to provide health and life insurance coverage for retirees of PST, Inc. under a series of Collective Bargaining Agreements (CBAs) entered into between PST and the United Steelworkers during the period from August 1, 1975 to July 31, 1988. Each one of these CBAs contained a "scope of agreement" provision which read:
 
 
 3
 "This Agreement and the supplemental letter agreements executed concurrently herewith constitute the sole and entire Agreement between the parties and supersedes all prior Agreements, oral or written, and expresses all of the obligations of or restrictions imposed on the respective parties during its term. Such Agreement can only be amended by a signed agreement executed by the parties. Such agreement shall be published and made available to employees."
 
 
 4
 The first Collective Bargaining Agreement between PST and the United Steelworkers relevant to this case covered the period from August 1, 1975 to July 31, 1978. Section 24.1 of that agreement read, in relevant part:
 
 
 5
 "24.1 Insurance
 
 
 6
 a. The Company shall select the insurance carrier(s) to provide the benefits provided in the Insurance Plans and agrees to continue the plans as described in the Insurance Booklet dated June 12, 1973 entitled 'Insurance Plan for Employees and Their Dependents Covering Hourly Employees--Life Insurance, Accident and Sickness, Hospital Surgical Expense--Major Medical Expense' and as revised.
 
 
 7
 b. The Company will continue for retired employees, the WPS Medicare Supplemental Plan premium contribution of $3.90 per month and $4.00 Medicare 'B' refund.
 
 
 8
 * * * * * *
 
 
 9
 d. The Company and the Union Insurance Committee will meet to revise the Insurance Booklet to incorporate changes either by issuing a new booklet or by issuing supplemental sheets, whichever appears more appropriate."
 
 
 10
 Prior to revision, the 1973 Insurance Booklet referred to in the CBAs contained the following language relevant to retiree insurance under the general heading of "Termination of Coverage":
 
 
 11
 "Termination of Employment
 
 
 12
 If not previously terminated, all coverage terminates at the end of the month in which employment terminates and seniority is lost (see 'Retirement' and 'Conversion' below).
 
 
 13
 * * * * * *
 
 Retirement
 
 14
 On retirement under the Normal, Disability, or Early Retirement provisions of the Pressed Steel Tank Hourly Pension Plan, at the end of the calendar month in which employment terminates, Accident and Sickness coverage terminates and Term Life Insurance coverage reduces to $1,000 (except that if the employee is eligible for a Disability Retirement Benefit his Term Life Insurance coverage will be continued at its present level (usually $7,500) until the end of the calendar month in which he attains age 65, at which time the coverage reduces to $1,000[ ) ]. Special Hospital-Surgical Expense coverage is available to the retired employee or the retired employee and his dependents if he makes the required quarterly contributions in advance for the coverage desired."
 
 
 15
 The booklet also contained the following provision under the topic of "Additional Information":
 
 
 16
 "Retired Employees
 
 
 17
 Upon retirement, participating employees should contact the Personnel Office to transfer directly into the pension group plan with no lapse of coverage. This change must be made within 30 days of the date of retirement."
 
 
 18
 Thus, the 1975-78 agreement provided for continuing health and welfare benefits for retirees at company expense. The joint union-company insurance committee published a revised Insurance Booklet in December 1976 that contained provisions materially identical to those quoted from the 1973 booklet. The revised booklet did, however, add a schedule of the company's contributions toward retiree health insurance. Further, in November 1977 PST filed a summary plan description with the Department of Labor (as required under ERISA) that contained the following language regarding retiree benefits:
 
 
 19
 "As an eligible retiree of the Pressed Steel Tank Co., Inc., the benefits listed below are available to you under this plan, with coverage effective upon your retirement date. Benefits include Health, Life and, for Early and Disability retirees, Dental insurance. Coverage will be effective upon your retirement date provided you agree to make any required contributions."
 
 
 20
 The Summary Plan Description also contained a "Loss of Benefits" section that provided:
 
 
 21
 "You must continue to be a member of the class to which the plan pertains and continue to make any of the contributions agreed to when you enrolled.
 
 
 22
 Failure to meet any or all of these requirements may result in partial or total loss of your benefits. The insurance booklet describes conditions which could result in a termination of benefits."
 
 
 23
 Neither the 1975-78 CBA nor the 1976 Insurance Booklet required contributions from retirees.
 
 
 24
 The parties entered into a 1978-81 Collective Bargaining Agreements that contained language identical to that found in Sections 24.1a. and 24.1d. of the 1975-78 agreement with the exception that the Insurance Booklet referred to was the 1976 edition. The Insurance Booklet issued in 1979 contained language similar to that of the 1976 Booklet with the exception that the death benefit on term life insurance was increased for retirees and changes were made in the company's contributions for retiree insurance. The bargaining agreement adopted for 1981-84 included the following language setting forth more explicitly the company policy of paying the cost of retiree insurance:
 
 
 25
 "24.1 Insurance
 
 
 26
 * * * * * *
 
 
 27
 e. Surgical-Medical
 
 
 28
 * * * * * *
 
 
 29
 5. Effective 8-01-82 the company will pay the full cost for retiree medical insurance. (No dental, no drug). Coverage will include 'carve out' provision and full Medicare-B-refund for retiree [sic] over age 65."
 
 
 30
 In April of 1982 the joint union-company insurance committee issued a revised Insurance Booklet that increased retiree life insurance coverage to $2,000 and provided that, effective August 1, 1982, all retirees, regardless of retirement date, would have their full insurance premium paid by PST.
 
 
 31
 AMCA International Corporation (the name under which United Dominion Industries, Inc. operated at all times relevant to this suit) acquired PST as a subsidiary in 1982. Thus, the negotiations for the 1984-86 Collective Bargaining Agreements were the first bargaining sessions in which United Dominion participated, and the resultant agreement included a significant revamping of employee health benefits. The new provisions of the CBA relevant to retiree medical benefits read as follows:
 
 
 32
 "24.1 a. The Company reserves the right to select or change the insurance carrier(s) or to self fund the negotiated group benefits.
 
 
 33
 b. The existing group medical, life, dental and accident and sickness coverages in effect on July 31, 1984 will be continued until the new group benefit plans become effective on October 1, 1984.
 
 
 34
 c. The existing group medical plan will be eliminated. In its place the company Comprehensive Health Plan will be installed. Employees will have the option of selecting the Company's Comprehensive Health Plan or one of the following Health Maintenance Organizations (HMO's):
 
 1. Compcare
 2. Family Health Plan
 3. Maxicare
 4. Samaritan Health Plan
 
 35
 ... The company will pay the full premium contribution for either option.
 
 
 36
 * * * * * *
 
 
 37
 g. Each employee shall be furnished a copy of the Group benefits booklet which shall contain the benefits negotiated."The Group benefits booklet issued in April 1985[1] set forth the following language regarding retiree health insurance:
 
 
 38
 "The class of Employees also includes eligible Retired Employees (including eligible dependents) who are retired in accordance with the retirement plan of the Company but limited in benefit coverage as follows:
 
 
 39
 1. Accident and sickness [disability] benefits are only provided to active employees.
 
 
 40
 2. Dental expense benefits are only provided to Disability Retirees (until they reach age 65) and their eligible dependents. Employees retiring early or at normal retirement age are not eligible for dental coverage.
 
 
 41
 3. Medical expense benefits, subject to a Medicare 'carve out' limitation, are available to retirees and eligible dependents."[2]
 
 
 42
 For the first time the booklet contained language which provided that both life and health insurance would terminate when the earliest of the following events occurred:
 
 
 43
 "[T]he date the plan is terminated;
 
 
 44
 * * * * * *
 
 
 45
 [U]pon expiration of the labor agreement unless extended, modified or amended by a subsequent agreement."
 
 
 46
 An endorsement contained in the booklet further provided that: "The right is reserved in the Plan for the Plan Sponsor to terminate, suspend, withdraw, amend or modify the plan in whole or in part at any time, subject to the applicable provisions of the Plan."
 
 
 47
 During the 1986-88 CBAs negotiations retiree insurance was a significant issue. PST made proposals to discontinue retiree benefits for persons who had not retired prior to August 31, 1986, and to provide a percentage of payment for insurance benefits to employees who chose to retire early in order to qualify for medical insurance benefits. The parties ultimately agreed to a reduction in the employer contribution for participants electing HMO coverage, and their Collective Bargaining Agreement contained a new Section 24.1j. specifically applicable to retired employees. The relevant provisions of the Collective Bargaining Agreement read as follows:
 
 
 48
 "24.1 a. The Company reserves the right to select or change the insurance carrier(s) or to self fund the negotiated group benefits.
 
 
 49
 b. The existing Comprehensive 80/20 health plan will constitute the Company's regular health plan. Additional HMO options are also available allowing employees the plan of their choice during the annual November open enrollment periods.
 
 
 50
 * * * * * *
 
 
 51
 For participants electing any HMO option the Company will pay the amount it pays for the Comprehensive 80/20 HSM program (currently: Single-$74.00, Family-$214.00 and $62.50-Single, $125-Family for those eligible for Medicare Part B) toward the monthly HMO and the participant will pay any monthly difference for HMO coverage.
 
 
 52
 * * * * * *
 
 
 53
 j. Group medical and life coverages and Medicare Part B reimbursement for (a) current retirees and (b) employees who retire during the current contract shall be continued during the term of this Agreement."
 
 
 54
 The benefits booklet issued in December 1986, pursuant to the new CBA, contained the same terms providing for the termination of benefits upon the expiration of the union contract or upon discontinuation of the insurance plan as the 1985 benefits booklet quoted above.
 
 
 55
 In January 1987 New Pressed Steel purchased the assets of PST from AMCA International. New Pressed Steel agreed to assume all liabilities and obligations for retiree health and life benefits with fifty percent of this amount offset against a debt New Pressed Steel owed to PST up to a maximum offset of $400,000. The sales agreement listed the name of each PST retiree to whom PST was liable for retiree health and medical benefits and set forth the medical insurance cost projected for each retiree projected on the basis of the retiree's life expectancy. From the date of sale until the termination of the Collective Bargaining Agreement on July 31, 1988, New Pressed Steel submitted claims to insurance providers, collected premium payments and forwarded the payments to the insurance carriers with the company's contributions. On the July 31, 1988 expiration date of the CBAs between PST and the United Steel Workers, the defendants ceased providing the retirees with any medical or life insurance coverage.
 
 II. PROCEDURAL BACKGROUND
 
 56
 The plaintiffs' complaint, as amended, alleged four causes of action. The first was a request for declaratory and injunctive relief as well as damages under Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), alleging that requiring the pre-August 1, 1986 retirees to pay any cost for insurance benefits and terminating the insurance coverage of all retirees on July 31, 1988, breached the defendants' obligations under the five Collective Bargaining Agreements.[3] In the second count the plaintiffs sought to receive benefits due and to clarify their rights to future benefits under Sections 502(a)(1)(B) and 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3).[4] The third count was a claim for breach of fiduciary duty under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).[5] The final count of the complaint was based upon an implied contract-detrimental reliance theory, alleging that the defendant had assured the retirees of lifetime post-retirement insurance benefits which the retirees relied upon to their detriment in retiring from the defendant's employ. In December 1988, the district judge granted the plaintiffs' request to certify the case as a class action under Federal Rule of Civil Procedure 23(b)(2), with the plaintiffs representing a class consisting of retired hourly employees who worked for PST after November 1975, their spouses and eligible dependents.
 
 
 57
 One week after the class was certified, the plaintiffs filed a motion for partial summary judgment on their claims under Section 301(a) of the Labor Management Relations Act and Sections 502(a)(1) and (a)(3) of ERISA. The court found that the Collective Bargaining Agreements were ambiguous, permitting the consideration of parol evidence. But, the trial court ruled that "the evidence--the CBAs, summary plans, booklets and deposition testimony--does not warrant summary judgment for the plaintiffs." The court granted the plaintiffs' demand for a jury trial, holding that the plaintiffs were entitled to it because they alleged a legal claim for breach of contract seeking monetary damages.[6]
 
 
 58
 A jury trial was held on December 4-11, 1989. At the close of the evidence the judge submitted for the jury's consideration a verdict form initially requesting that the jury answer the following three questions with respect to persons who retired during the 1975-78 Collective Bargaining Agreement:
 
 
 59
 "As to employees of the company who retired when the 1975-78 collective bargaining agreement was in effect:
 
 
 60
 A-1. Have the plaintiffs convinced you that the 1975-78 collective bargaining agreement between the owners of Pressed Steel and the steelworkers union is unclear and ambiguous as to how long welfare benefits must be paid to retirees?
 
 Yes ___
 No ___
 
 61
 If you answered 'yes' to question A-1, then answer the following question.
 
 
 62
 A-2. Have the plaintiffs convinced you that it is necessary to go outside the agreement to interpret (not vary) what the intent of the company and union was as to the duration of retirees' welfare benefits?
 
 Yes ___
 No ___
 
 63
 If you answered 'yes' to question A-2, then answer the following question.
 
 
 64
 A-3. Considering all the evidence in this case, have the plaintiffs convinced you that the company and the union intended that retirees under the 1975-78 agreement would receive welfare benefits for the rest of their lives?
 
 Yes ___
 
 65
 No ___"
 
 
 66
 The form requested the jury to answer the same three questions for persons who retired within the effective dates of the four subsequent CBAs. After only twenty minutes of deliberation the jury answered all the questions in the affirmative, finding that the union and the company had intended to enter into binding agreements to provide lifetime benefits to retired employees under each of the five Collective Bargaining Agreements.
 
 
 67
 Following the jury verdict, the trial court entered judgment for the plaintiffs. The court noted that the jury's role in resolving the first of its verdict questions regarding whether the Collective Bargaining Agreements were ambiguous involved a question of law and was "advisory" only. But, the judge stated his concurrence with the jury's result and pointed out that he had independently reached the same resolution regarding contractual ambiguity in his order denying partial summary judgment. The judge went on to state that he was "in complete agreement with the jury's assessment of the case on every issue it decided." Thus, the court found United Dominion and PST liable for lifetime benefits under the Collective Bargaining Agreements and held New Pressed Steel liable for breach of fiduciary responsibility under ERISA Section 404(a)(1). The court ruled that the following injunction, which the plaintiffs proposed, provided appropriate relief:
 
 
 68
 "1. The defendants must reinstate medical benefit coverages for retirees which were in effect immediately prior to July 31, 1988, (including Medicare Part B reimbursement) to all hourly retirees of the PST plan in West Allis, Wisconsin, who worked there in November 1975 or after, as well as such retirees' spouses and eligible dependents.
 
 
 69
 2. The defendants must provide life insurance with a death benefit of $2,000 for all hourly retirees of the PST plan in West Allis, Wisconsin, who worked there in 1975 or after, and, for disability retirees, a death benefit equal to their last level of death benefit as active employees until they reach the age of sixty-five (65), at which time the death benefit shall reduce to $2,000.
 
 
 70
 3. The cost of providing the above benefits shall be borne entirely by the defendants, jointly and severally, except that retirees who retired after August 1, 1986, shall contribute, for medical benefits only, the excess, if any, between the monthly premium cost of their selected HMO coverage and the monthly premium cost of the comprehensive 80/20 health plan.
 
 
 71
 4. The medical and life benefit coverages and Medicare Part B reimbursement shall be continued throughout the life of each retiree."
 
 
 72
 The judge then referred the case to a magistrate for the purposes of calculating damages incurred as a result of New Pressed Steel's refusal to pay retiree life and health benefits subsequent to July 31, 1988.
 
 III. ISSUES PRESENTED
 
 73
 This appeal raises the following issues: (1) Whether the trial court erroneously permitted a jury trial; (2) Whether the district court erred in finding that United Dominion Industries and PST, Inc. violated obligations under the Collective Bargaining Agreements with the United Steel Workers when they terminated health and life insurance benefits at the expiration of the 1986-88 CBA on July 31, 1988 and when they charged pre-1986 retirees for the expenses of HMO coverage under the 1986-88 Collective Bargaining Agreement; and (3) Whether the district court improperly determined that New Pressed Steel violated a fiduciary duty under Section 404(a)(1) of ERISA in failing to provide insurance benefits to retirees for life and in charging pre-1986 retirees the expenses of HMO coverage between 1986 and 1988.[7]
 
 IV. RIGHT TO JURY TRIAL
 
 74
 The defendants assert that the trial court erroneously granted the plaintiffs a jury trial on their claim under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) and Sections 502(a)(1) and (a)(3) of ERISA, 29 U.S.C. § 1132(a)(1) and (a)(3).[8] When determining whether the Seventh Amendment to the United States Constitution requires a jury trial of a particular issue, the United States Supreme Court has mandated that the following analysis be undertaken:
 
 
 75
 " 'First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.' Tull v. United States, 481 U.S. 412, 417-18, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987) (citations omitted). The second stage of this analysis is more important than the first. Id. at 421, 107 S.Ct., at 1837."
 
 
 76
 Granfinanciera S.A. v. Nordberg, 492 U.S. 33, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989). Count one of the plaintiffs' second amended complaint requested monetary damages under Section 301 of the LMRA for breach of contract. As the Supreme Court noted in its analysis of 18th-century actions in Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 110 S.Ct. 1339, 1347, 108 L.Ed.2d 519 (1990), a claim under Section 301 that the employer breached a Collective Bargaining Agreement "is comparable to a breach of contract claim--a legal issue." In Terry, however, the only relief sought was compensatory damages, while the plaintiffs in the instant case are primarily seeking injunctive relief, a remedy traditionally available from courts of equity alone. The claim for monetary damages could be characterized as incidental to the request for an injunction. It is well settled that when legal and equitable relief are separately authorized by statute, and the "legal claim is joined with [the] equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as 'incidental' to the equitable relief sought." Tull v. United States, 481 U.S. 412, 424-425, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987) (quoting Curtis v. Loether, 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 1009 n. 11, 39 L.Ed.2d 260 (1974)). Because the plaintiffs instituted a legal claim for breach of contract and sought legal relief in the form of compensatory damages pursuant to Section 301 of the LMRA, in addition to injunctive relief pursuant to Sections 404(a)(1), 502(a)(1)(B) and 502(a)(3) of ERISA, the Seventh Amendment provided them with a right to a jury trial. Thus, the trial court acted properly in ordering a jury trial on the issue of whether the defendants breached the CBA in violation of Section 301(a) of the Labor Management Relations Act and Sections 502(a)(1) and (a)(3) of ERISA.
 
 
 77
 V. RETIREES' CONTRACTUAL ENTITLEMENT TO LIFETIME INSURANCE
 
 BENEFITS AND PRE-1986 RETIREES' RIGHT TO FULLY
 PAID HMO BENEFITS
 
 78
 The central issue in this case is whether Collective Bargaining Agreements and plan documents entitled retirees to welfare benefits for the rest of their lives and pre-1986 retirees to fully paid HMO benefits. The trial court accepted the jury's verdict that the parties intended to contract for lifetime welfare benefits for persons who retired during the terms of each of the five CBAs between PST and the United Steelworkers and determined that retirees were entitled to these benefits.
 
 
 79
 In Ryan v. Chromalloy American Corp., 877 F.2d 598, 602-03 (7th Cir.1989), we held that ERISA did not establish a statutory right of vesting for welfare benefits. But, we observed that employers and unions may choose to enter agreements for welfare benefits to vest:
 
 
 80
 "[P]arties are free to subject ... welfare benefits to vesting requirements not provided by ERISA, or they may reserve the power to terminate such plans. As the Sixth Circuit has stated in Hansen v. White Farm Equipment Co., 788 F.2d 1186 (6th Cir.1986), 'the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated.' Id. at 1193."
 
 
 81
 Id. at 603. We have further recognized the legal proposition that, in the absence of an agreement to the contrary, a company is not obligated to continue retiree welfare benefits after the expiration of the contract:
 
 
 82
 "The entitlements established by collective bargaining agreements do not survive their expiration or modification. So if, for example, the 1982-85 agreement had established a plan under which Jewel provided health benefits for its employees and retirees, the Union and Jewel would had been free to abolish those benefits for subsequent periods, even though the Union does not represent retirees. If the Union and Jewel had reached an impasse, Jewel would have been free to put into place its last proposal, which might not have included health benefits. Anderson v. Alpha Portland Industries, Inc., 836 F.2d 1512 (8th Cir.1988); Bartman v. Allis-Chalmers Corp., 799 F.2d 311 (7th Cir.1986); cf. DeGeare v. Alpha Portland Industries, Inc., 837 F.2d 812 (8th Cir.1988) (ERISA does not alter the rule of labor law in this respect). That the retirees had worked in earlier years in the expectation that they were receiving money today and health benefits later would not matter. Because of the time limit on the collective bargaining agreement any subjective expectation they may have had is not enforceable."
 
 
 83
 Merk v. Jewel Cos., Inc., 848 F.2d 761, 763 (7th Cir.), cert. denied, 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988). Furthermore, as we noted in Ryan, the question of whether Collective Bargaining Agreements and plan documents contain agreements to vest entitlement to lifetime retirement benefits should be determined without reference to extrinsic evidence if the terms of the writings involved are unambiguous:
 
 
 84
 "If a district court determines that the pertinent provisions of the contract are unambiguous, it need not consider extrinsic evidence. At that point, the district court should proceed to declare the meaning of those provisions, an interpretation which this court reviews de novo as a question of law."
 
 
 85
 Ryan, 877 F.2d at 602. See also U.S. Fire Ins. Co. v. Pressed Steel Tank Co., Inc., 852 F.2d 313, 316 (7th Cir.1988) ("If the contract is unambiguous, the court is to construe it as a matter of law."); Jackman v. WMAC Invest. Corp., 809 F.2d 377, 380 (7th Cir.1987) ("In Wisconsin ... parol evidence is not admissible to vary the terms of a complete and unambiguous contract....").
 
 
 86
 The initial 1975-78 CBA between PST and the Steel Workers in conjunction with the Insurance Booklets[9] effective during the term of this agreement provided only that retired employees would receive insurance coverage and that company contributions would be made toward this insurance. (See supra at 2-4). The contract documents contained no language that established a vested right for persons who were retired during the term of the agreement to enjoy welfare benefits after the termination of the Collective Bargaining Agreement. Similarly, neither the 1978-81 Collective Bargaining Agreement, the 1981-84 Collective Bargaining Agreement nor the Insurance Booklets issued during the terms of these contracts contained any language supporting retirees' entitlement to welfare benefits after the expiration of the CBAs involved. Rather, the text of the 1981-84 contract and the Insurance Booklets incorporated by reference into both the 1978-81 and 1981-84 contracts merely provided for employer contributions to insurance benefits for retirees during the effective periods of the respective Collective Bargaining Agreements. Nothing was stated concerning any benefits retirees would receive when the Collective Bargaining Agreements expired. The 1984-86 and 1986-88 CBAs and the Group benefits booklets incorporated therein by reference provide even less support for a right to benefits following the expiration of the Collective Bargaining Agreements. The 1984-86 Collective Bargaining Agreement, in contrast to the 1981-84 CBA, included no language specifically referring to retiree insurance benefits, even though it effected a thorough restructuring of the company's welfare benefits program. Further, the Group benefits booklet issued during the effective period of the 1984-86 contracts specifically provided that insurance benefits would end upon either the termination of the employer's welfare benefit plan or the expiration of the Collective Bargaining Agreement. In the final 1986-88 contract, any argument for retiree benefits following the expiration of the Collective Bargaining Agreement was severely undercut with language that provided:
 
 
 87
 "Group medical and life coverages and Medicare Part B reimbursement for (a) current retirees and (b) employees who retire during the current contract shall be continued during the term of this Agreement."
 
 
 88
 (Emphasis added). Furthermore, the Group benefits booklet issued during the term of the final CBA continued the language added to the April 1985 booklet that explicitly provided that retiree insurance coverage would terminate upon the earlier of the plan's termination or the expiration of the governing Collective Bargaining Agreement. In short, our examination of the relevant Collective Bargaining Agreements and plan documents incorporated therein by reference reveals that they are void of any language that would provide the basis for finding an ambiguity in regard to a vestment of lifetime welfare benefits to employees who retired under the terms of any of the five Collective Bargaining Agreements. Thus, under our holdings in Ryan and Merk, set forth above, the retirees possessed no vested interest in welfare benefits, and the entitlements did not survive the expiration of the CBAs.
 
 
 89
 The district court held that the Collective Bargaining Agreements and plan documents were ambiguous, as they referred to continued coverage for retirees, which could be interpreted to mean that the company "would provide benefits for the life of those who retire during the term of the contract...." Thus, the trial court held that resort to extrinsic evidence was necessary to resolve the issue of the plaintiffs' entitlement to lifetime welfare benefits. We disagree. The default rule in this Circuit is that "entitlements established by collective bargaining agreements do not survive their expiration or modification." Merk, 848 F.2d at 763. Thus, it requires more than a statement in a CBA that welfare benefits "will continue" to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits "will continue" for the duration of the contract. Moreover, the Collective Bargaining Agreements and plan documents at issue are either silent on the question of whether a right to lifetime benefits should vest or appear to explicitly prohibit such vesting (i.e., the 1985 and 1986 Insurance Booklets and the 1986-88 Collective Bargaining Agreement). The mere silence of Collective Bargaining Agreements and plan documents concerning the vestment of welfare benefits fails to give rise to an ambiguity. Rather, this silence and the explicit repudiation of any possible basis for a lifetime benefits claim in the 1986-88 Collective Bargaining Agreement as well as the 1985 and 1986 Group benefits booklets referenced therein demonstrate that the signatories to the contract did not intend that a lifetime right to welfare benefits would vest in retirees. Because there was no agreement to continue welfare benefits for retirees on a lifetime basis and because there was no ambiguity warranting the admission of extrinsic evidence on this issue, we disagree with the trial court's conclusion that United Dominion Industries and PST were contractually liable for lifetime insurance benefits for retirees and that the termination of benefits violated Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) and Sections 502(a)(1) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(1) and (a)(3).
 
 
 90
 The same analysis also leads us to disagree with the trial court's finding that United Dominion and PST violated 29 U.S.C. § 185(a) and 29 U.S.C. §§ 502(a)(1) and (a)(3) when, during the term of the 1986-88 Collective Bargaining Agreement, they required retirees electing HMO coverage to pay the cost difference between an HMO health insurance coverage plan and conventional health insurance coverage. Because there was never a vested right for retirees to receive any form of welfare benefits, it follows that there was no vested right for them to receive a specific type of health insurance coverage at a particular cost. Thus, requiring pre-1986 retirees to pay the difference between HMO and conventional insurance coverage in accordance with the 1986-88 CBA and plan documents was permissible under both Section 301(a) of the Labor Management Relations Act and Sections 502(a)(1) and (a)(3) of ERISA.
 
 
 91
 VI. FIDUCIARY DUTY TO PROVIDE RETIREES WITH LIFETIME WELFARE BENEFITS
 
 
 92
 The trial court also found that New Pressed Steel violated Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), when as a successor fiduciary, it "had actual knowledge of the decision to terminate benefits. [Thus, New Pressed Steel] is liable to the plaintiffs."[10] While we have not previously addressed the precise issue of whether an employer administering a retiree welfare plan has a fiduciary duty to continue providing health benefits after the expiration of the contract requiring such benefits, the Sixth Circuit has made clear that an employer's choice to reduce welfare benefits will not give rise to a claim for breach of fiduciary duty under ERISA:
 
 
 93
 "There is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second. As this court, speaking through Judge Celebrezze, declared in Moore v. Reynolds Metals Co. Retirement Program, 740 F.2d 454, 456 (6th Cir.1984),
 
 
 94
 '[n]either Congress nor the courts are involved in either the decision to establish a plan or in the decision concerning which benefits a plan should provide. In particular, courts have no authority to decide which benefits employers must confer upon their employees; these are decisions which are more appropriately influenced by forces in the marketplace and, when appropriate, by federal legislation.'
 
 
 95
 Congress ... 'has not prohibited an employer who is also a fiduciary from exercising the right accorded other employers' to amend plan provisions regarding unfunded contingent benefits. Such changes ... 'are not to be reviewed by fiduciary standards.'
 
 
 96
 " ... National Life had no fiduciary duty to establish any medical insurance plan, much less one that could never be amended without the approval of those to whom it applied. It is hard to see how the company's express reservation of a right to amend the plan can be said to constitute 'overreaching' when a prudent employer, mindful of the possibility that medical costs might skyrocket, could well have decided, if given the slightest reason to suppose the future amendments to the medical insurance coverage could be invalidated under ERISA, not to provide such coverage at all, or to impose the most stringent limits on any coverage provided.
 
 
 97
 "The case law, in any event, makes it clear that when an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards. 'ERISA's concern is with the elements of a plan and its administration after it has been established rather than to mandate the creation of a program. ERISA does not require an employer to establish a hospitalization plan nor continue it indefinitely.' "
 
 
 98
 Musto v. American General Corp., 861 F.2d 897, 911-12 (6th Cir.1988) (quoting Viggiano v. Shenango China Division of Anchor Hocking, 750 F.2d 276, 279 (3d Cir.1984)) (citations omitted) (emphasis added). See also Young v. Standard Oil (Indiana), 849 F.2d 1039, 1045 (7th Cir.1988) ("[A]n employer does not owe its employees a fiduciary duty when it amends or abolishes a severance benefit plan.").
 
 
 99
 The plaintiffs' attempt to distinguish Musto is based on their position that United Dominion Industries and PST had a contractual duty to provide lifetime benefits to all employees and to fully fund the HMO benefits of pre-1986 retirees, which in turn gave rise to a duty on the part of New Pressed Steel, in its alleged capacity as a successor fiduciary, to honor these promises.[11] As we held in Section V, supra, the parties' Collective Bargaining Agreements and plan documents did not require either United Dominion or PST to provide retirees with lifetime benefits or to furnish fully-paid HMO benefits for pre-1986 retirees. Thus, the reasoning of Musto that an employer's decision to amend an unfunded plan provision is "not to be reviewed by fiduciary standards," id. at 911, supports a holding that Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), did not impose any fiduciary duty upon New Pressed Steel to provide lifetime benefits for all retirees or to continue fully-paid HMO benefits for pre-1986 retirees. We agree that "when an employer decides to establish, amend, or terminate a benefits plan ... its actions are not to be judged by fiduciary standards." Musto, 861 F.2d at 912.
 
 VII. CONCLUSION
 
 100
 We certainly are sympathetic to the plight of retirees who may have erroneously thought that the company would pay the cost of their life and health insurance throughout their lifetimes. But we are not permitted to allow our sympathies and desires to vitiate clear principles of contract and labor law, and in particular, we refuse to amend the clear terms of the health and welfare benefits contained in the Collective Bargaining Agreements. Since ERISA does not provide for vesting of welfare benefits, vestment of lifetime benefits must arise from the Collective Bargaining Agreements. The unambiguous terms of the contracts at issue fail to provide for vesting. Thus, we hold that there was no obligation under the Collective Bargaining Agreements, plan documents or ERISA fiduciary responsibilities for the defendants to provide lifetime welfare benefits to the plaintiffs or to continue fully-paid HMO benefits for pre-1986 retirees. The judgment of the district court is
 
 
 101
 REVERSED.
 
 
 102
 WILL, Senior District Judge, concurring.
 
 
 103
 I concur in Judge Coffey's analysis and opinion and, particularly, in his expression of sympathy for retirees who have received and relied upon company financed life and health insurance plans for many years and who then suddenly find themselves unprotected. This case is not an isolated example and is one of the reasons for the growing demand that some form of national health plan be adopted so that retirees and other persons will be able to afford and secure the medical services they need. Given the fact that retirees require progressively more medical treatment as they age and that there will continue to be more of them, it is particularly important that some comprehensive long-term plan other than the present diminishing Medicare program be adopted for their protection.
 
 
 
 *
 The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The Group benefits booklets issued in 1985 and thereafter were written by the company alone rather than a joint union-company insurance committee
 
 
 [2]
 The booklet also provided for life insurance benefits for retired employees
 
 
 [3]
 Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) provides:
 "Venue, amount and citizenship
 (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."
 
 
 [4]
 These sections provide:
 "Persons empowered to bring a civil action
 A civil action may be brought--
 (1) by a participant or beneficiary--
 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
 (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter of the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan...."
 
 
 [5]
 This section provides:
 "(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries...."
 
 
 [6]
 The court reaffirmed this ruling after the defendant sought to strike the plaintiffs' jury demand, shortly prior to trial, on the ground that a jury trial is not available in a suit in which the plaintiffs are primarily seeking injunctive relief
 
 
 [7]
 The defendants raise additional claims asserting that the trial court impermissibly submitted the question of contractual ambiguity for an "advisory" jury verdict, provided improper instructions and verdict forms to the jury and issued defective findings of fact and conclusions of law regarding the liability of the defendants for lifetime retiree insurance benefits and for expenses incurred by pre-1986 retirees. We need not reach these issues in light of our holding, infra that the defendants are not liable for lifetime benefits for retirees or for insurance expenses incurred by pre-1986 retirees
 
 
 [8]
 The trial court did not submit the plaintiffs' fiduciary duty claims under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1) to the jury
 
 
 [9]
 Since the Insurance Booklets as well as the subsequent Group benefits booklets were explicitly incorporated into each of the collective bargaining agreements, they constitute part of the contract rather than extrinsic evidence
 
 
 [10]
 As discussed previously, the trial court found that United Dominion Industries and PST breached a contractual promise to pay lifetime benefits to retirees in violation of Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) and Sections 502(a)(1) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(1) and (a)(3). The trial court did not reach the question of whether these two defendants' conduct also violated Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1)
 
 
 [11]
 In light of our holding, supra, that there is no fiduciary duty to provide lifetime benefits or to continue fully-paid HMO benefits for pre-1986 retirees under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), we need not address the question of whether New Pressed Steel was a fiduciary for purposes of this section of ERISA