William R. MURPHY, W. Darrel McCabe, Richard L. Adkins, and Independent Steel Workers Alliance, Plaintiffs,

v.

KEYSTONE STEEL & WIRE COMPANY, A DIVISION OF KEYSTONE CONSOLIDATED INDUSTRIES, INC., a Delaware Corporation; and Keystone Steel & Wire Company Health Care Benefit Plan, Defendants.

No. 93–1247.

United States District Court, C.D. Illinois.

May 2, 1994.

Ronald L. Hamm, Hamm & Hanna, Peggy L. Jans, Peoria, IL, for plaintiffs.

Stephen D. Gay, Jeffrey Alan Ryva, Husch Eppenberger Donohue Cornfeld & Jenkins, Peoria, IL, for defendants.

## ORDER

McDADE, District Judge.

Plaintiffs William R. Murphy, W. Darrel McCabe, and Richard L. Adkins (the "Retirees") are retired, former employees of Defendant Keystone Steel & Wire Company, a Division of Keystone Consolidated Industries, Inc. ("Keystone"). Plaintiff Independent Steel Workers Alliance ("Union") is and has been the collective bargaining agent for Keystone's active employees during and since the Retiree's employment at Keystone. Defendant Keystone Steel & Wire Company Health Care Benefit Plan ("the Plan") is a self-insured plan which provides health care benefits for certain of Keystone's retirees and their dependents. The Retirees and Union have brought suit against Keystone and the Plan for breach of contract under Section 301 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185 and for clarification and enforcement of their rights to future health care benefits under Keystone's employee welfare benefit plan including injunctive and other relief under § 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and (a)(3). This action was given class certification by District Court Chief Judge Michael M. Mihm on September 27, 1993, to include as Plaintiffs all former bargaining unit employees of Keystone who

retired from Keystone prior to May 3, 1993, and who had not attained the age of 65 before July 1, 1993, a class consisting of approximately 900 retired workers (hereinafter the "Retirees" include the named Plaintiffs and the class they represent).

### BACKGROUND FACTS

This case concerns the obligation of Keystone to provide health care benefits for the Retirees under a series of Collective Bargaining Agreements ("CBAs" or "CBA" when referring to a specific agreement) entered into between Keystone and the Union during the period from February 4, 1960,[1] to May 3, 1993.[2]

The controversy stems from unilateral action taken by Keystone on February 24, 1993, when it announced prospective changes effective July 1, 1993, in its then-current health care benefit plan for those retirees under 65 years of age as of July 1, 1993, namely, the Retirees in this lawsuit. Essentially, this announced new plan provided for a larger annual deductible in varying amounts depending upon age and a larger co-payment percentage for retirees. The Amended Complaint alleges that Keystone was obligated to continue to provide the Retirees with the same health care benefits being provided active employees and other retirees (not included in the class) under the health care benefit plan established and maintained pursuant to the then-current CBA. The Plaintiffs brought this action on June 30, 1993, a day before the new health care benefit plan was to become effective.

The health care benefit plan in effect at the time of Keystone's announced changes was embraced by the CBA dated May 3, 1990 ("1990 CBA"), for a three-year term expiring May 3, 1993.[3] The "Insurance and Health Care" agreement referenced in the 1990 CBA was "Keystone Steel & Wire Company Welfare Company Benefit Plan for Bargaining Unit Employees" dated July 1, 1986 ("1986 Plan"). (Ziegele Affidavit, Exh. S). This is the health care benefit plan which was in effect at the time Keystone announced the prospective changes in the health care benefit plan for the Retirees to take effect July 1, 1993. It provided identical health care benefits for active employees and *all* retirees. Section IV covered hospital, medical, and surgical benefits. Under the terms of this plan, active employees had to contribute $15.00 per month for coverage, and in connection with *major medical* benefits, there was an annual deductible of $100 per individual and $150 per family, a co-payment requirement of 20%, and a lifetime maximum benefit amount of $50,000 per enrollee. There is no language in the plan requiring Retirees to contribute any money for coverage under the plan, nor is there language specifically applying the limitations on major medical benefits to Retirees. On February 1, 1993,[4] Keystone terminated[5] (effective

---

**1.** The earliest retirement date of any living retiree who is a member of the certified class or deceased retiree whose surviving spouse or dependent is a class member is July 31, 1962. (Cherie DeMaster, Affidavit # 5).

**2.** The most recent collective bargaining agreement is dated May 3, 1993. (Ziegele Affidavit, Exh. V). Prior CBAs, typically having a three-year term, were dated February 4, 1960; February 4, 1963; May 3, 1966; June 8, 1969; May 3, 1972; May 3, 1972 (1975 Revision); May 3, 1982; May 3, 1984; contract extension dated June 20, 1986 through May 3, 1990; and May 3, 1990. (Ziegele Affidavit, Exhs. A–J respectively).

**3.** Article XXIII, paragraph 23.0 referenced the "Insurance and Health Care" agreement as being one of several agreements which *"will remain in effect during the term of this agreement all as heretofore agreed upon and as revised."* (Emphasis added.) Article XXIII is the only reference made in the CBA to Keystone's health care benefit plan. The various CBAs typically included memoranda of understanding between Keystone and the Union. As part of the 1990 CBA, "Memorandum of Understanding: # 11" sets out certain changes the parties agree to make in "Hospital, Medical, Surgical and Major Medical" ... "for the term of this agreement." All of the preceding CBAs going back to the one dated May 3, 1972, referenced the insurance and health care agreements with similar language, without any material differences. (Ziegele Affidavit, Exhs. E–I). Prior to May 3, 1972, there were some material differences in the language of reference which will be discussed *infra*.

**4.** Notice of this action was mailed by Keystone to the Retirees on February 24, 1993. (Ziegele Supp. Affidavit, para. 6, Exh. C).

**5.** The Court's use of the word "terminated" does not imply that Keystone's action was in fact a termination of the Plan, as opposed to an amend-

June 30, 1993) the health care benefit coverage for the Retirees under this plan. (Supplemental Affidavit of Ziegele, para. 4(a)). On that same date, Keystone adopted a new plan for the Retirees, Keystone Steel & Wire Company Health Care Plan for Bargaining Unit Current Retirees ("Retirees' New Plan"), effective as of July 1, 1993. (Ziegele Supp. Affidavit, para. 4(b), Exh. B).

A new CBA dated May 3, 1993, with a term expiring on May 3, 1996, ("1993 CBA") was negotiated to replace the 1990 CBA. (Ziegele Affidavit, Exh. V). This is the current CBA and, like its predecessors, contains the same language in Article XXIII, Section 23.0 referencing certain agreements which are to remain in force during the term of the CBA, one of which is the "Insurance and Health Care" agreement.[6] According to Keystone, the "Insurance and Health Care" agreement referenced did not include the "Retirees' New Plan" but was meant to refer only to the health care plan covering active employees and certain retirees other than the Plaintiff Retirees. (Ziegele Supp. Affidavit, para. 12–15). The Plaintiffs do not dispute this assertion.[7] As far as the Court can tell, this would be the 1986 Plan previously mentioned.

The Retirees' New Plan differs from the 1986 Plan in several major respects. The dichotomy of "basic" and "major medical" coverage in the 1986 Plan is replaced by "comprehensive medical benefits" in the Retirees' New Plan. The deductible in the Retirees' New Plan is increased and varies depending upon the age of the retiree. The co-payment percentage is increased to 25%. The lifetime maximum benefit is increased to $750,000. (Ziegele Supp. Affidavit, Exh. B).

## CLAIMS

Counts I and III are brought under § 301(a) of LMRA. In Count I, Plaintiffs allege that each of the CBAs negotiated over the years constituted a binding contract obligating Keystone to provide "certain medical, surgical, hospital, and other health care benefits to retired employees, their spouses, and eligible dependents," and to continue these health care benefits "throughout the lifetime of each retired employee and each surviving spouse of a retired employee" ("the Retirees"). (Amended Complaint, para. 18). By terminating the health care program established and maintained pursuant to each of the CBAs and unilaterally creating a new health care plan for the Retirees, which shifts a larger portion of the cost of health care benefits to the Retirees, Plaintiffs claim that Keystone has breached the CBAs. The theory of Count III appears to be that the various health care plans in effect over the years, pursuant to the various CBAs, acquired the mantle of a CBA, and they themselves constitute binding contracts between Keystone and the Union, enforceable under § 301(a) of LMRA. According to this theory, these health care plans were breached by Keystone when it separated the Retirees out of the 1986 Plan and created the Retirees' New Plan which shifted a larger portion of

---

ment. The changes made to the 1986 Plan did not eliminate coverage, thereby terminating the Plan; on the contrary, the changes affected the persons covered (the Retirees were excluded) more in the nature of an amendment to the Plan. In other words, the Plan itself was never terminated; only the persons covered by the Plan were changed. As interpreted by the Court, the language of the Plan and the CBAs permit this change because the duration of coverage exists only for the term of the relevant collective bargaining agreement. This interpretation is borne out by Plaintiffs' concession that Keystone has previously given the Retirees more benefits in the CBAs. The only difference in this case is that Keystone's changes took away benefits rather than adding them, as had been done in the past. *See infra* note 12.

6. The Memorandum of Understanding: # 11 attached to the 1993 CBA indicated that the parties had agreed to certain changes under the heading *Medical, Surgical, and Major Medical* and specifically stated that "those employees who retire on or after May 3, 1993, will be entitled to receive the same benefits on the same basis as active employees." These changes were stated to be for the "... term of this agreement."

7. Although a union need not represent non-employees such as retirees, it may if the employer is willing. *See Merk v. Jewel Companies, Inc.,* 848 F.2d 761 (7th Cir.1988), *citing, Allied Chemical & Alkali Workers v. Pillsbury Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). Obviously, it is in the interest of both the union (representing employees who will one day retire) and the employer (who wants a continuous committed labor force) to negotiate retiree benefits.

insurance benefit costs away from Keystone to the Retirees.

Count II is an ERISA action. The claim is that the CBAs and health care plans maintained pursuant thereto were "employee welfare benefit plans" within the meaning of ERISA. Based upon the same allegations underlying Counts I and III, Plaintiffs claim that they are entitled to lifetime health care benefits as negotiated between Keystone and the Union. They seek enforcement and clarification of their rights under the ERISA protected employee welfare benefit plans.

## LEGAL STANDARDS

Before the Court are cross-motions for summary judgment on Counts II and III of the Amended Complaint. Although not briefed by either of the parties, the Court will also include Count I in its consideration of the cross-motions for summary judgment since the CBAs are an integral part of any analysis. Each of the parties argues that no genuine issues of material fact exist since the question is one of contract interpretation.

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact.

■ As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

■■ As to genuine issue, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As stated in *Anderson,* "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." When a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, or is no more than a scintilla, a summary judgment may be granted.

■ The Seventh Circuit Court of Appeals has recognized that summary judgment is particularly appropriate in cases involving the interpretation of contractual documents. *Ryan v. Chromalloy American Corp.,* 877 F.2d 598 (7th Cir.1989). In that context, the *Ryan* opinion stated:

> "... summary judgment should be entered only if the pertinent provisions of the contractual documents are unambiguous: it is the lack of ambiguity within the express terms of the contract that forecloses any genuine issues of material fact. *Id.* If a district court determines that the pertinent provisions of the contract are unambiguous, it need not consider extrinsic evidence. At that point, the district court should proceed to declare the meaning of those provisions."

*Id.* at 608.

Pursuant to the controlling legal standards, the threshold matters to resolve are ascertainment of the relevant contractual documents in connection with each claim and whether their pertinent provisions are ambiguous or not. If they are ambiguous, extrinsic evidence submitted by the parties may be considered in interpreting their

meaning, and summary judgment would probably not be appropriate. *Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385 (7th Cir.1993) (after a court rules that a contract is ambiguous, it may consider extrinsic evidence to resolve an ambiguity).

What are the relevant contractual documents between Keystone and the Union? The various CBAs, standing alone, clearly are not meant to be the complete and final expression of the parties' agreement with respect to Keystone's obligation to provide health care benefits to its employees and retirees. The health care plan document referenced in the CBAs must necessarily be included in order to have a complete and fully integrated contract since they are the documents which set forth and govern the provision of health care benefits.[8] Therefore, the relevant contract documents for purposes of Counts I and III are the CBAs and related health care plans maintained pursuant thereto.

A related task is to identify the specific CBA and health care plan controlling the issues involved in this case. One approach, apparently pled in the Amended Complaint, but neither argued nor briefed by the parties, would be to analyze for each member of the Retiree class the particular CBA and related health care plan in force at the time he or she retired, thereby requiring the Court to interpret all such contracted documents since 1960. The approach taken by the parties in their briefs and argument (which also has some presence in the Amended Complaint) assumes that the last CBA in force prior to the changes establishing the Retirees' New Plan, namely the 1990 CBA and related health care plan (the 1986 Plan), are the pertinent contractual documents which apply to all members of the Retirees' class. This latter approach has been accepted by the Court in deciding the issues in this case.

### APPLICABLE LAW

The issues for determination have already been considered by the Seventh Circuit Court of Appeals, albeit in context of varying factual nuances, in a recent trilogy of cases. *Ryan v. Chromalloy American Corporation,* 877 F.2d 598 (7th Cir.1989); *Senn v. United Dominion Industries, Inc.,* 951 F.2d 806 (7th Cir.1992); and *Bidlack v. Wheelabrator Corporation,* 993 F.2d 603 (7th Cir.1992).

■ ERISA provides a private right of action to any beneficiary or participant to enforce the terms of either a pension or a welfare benefit plan. *See* 29 U.S.C. § 1132(a)(1) and (3). The plan in this case is a welfare benefit plan; however, unlike pension plans, "... ERISA does not require the vesting of health or other 'welfare' benefits (citations omitted), ... but equally it does not forbid their vesting by a written contract, ... which could be part of a collective bargaining agreement." *Bidlack v. Wheelabrator,* 993 F.2d at 604. Therefore, the efficacy of the Retirees' claim under ERISA in Count II turns solely upon the terms of the written instruments governing the 1986 Plan. As stated in *Ryan:*

> ... ERISA requires that '[e]very employee benefit plan ... be established and maintained pursuant to a written instrument.' 29 U.S.C. § 1102(a)(1). Through those instruments, the parties are free to subject such welfare benefits to vesting requirements not provided by ERISA, or they may reserve the power to terminate such plans. As the Sixth Circuit has stated in *Hansen v. White Farm Equipment Co.,* 788 F.2d 1186 (6th Cir.1986), 'the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated.' (citations omitted.)

*Ryan v. Chromalloy,* 877 F.2d at 603.

■ *Ryan, Senn,* and *Bidlack* provide controlling guidelines. *Ryan v. Chromalloy* teaches that: (1) summary judgment should be entered only if pertinent provisions of contractual documents are unambiguous, and it is the lack of ambiguity within the express terms of the contract that forecloses any genuine issue of material fact; (2) extrinsic evidence cannot create an ambiguity in oth-

---

**8.** Beginning with the health care plan dated January 1, 1985, the plan also acted as the Summary Plan Description required by ERISA. (See Ziegele Affidavit, Exh. Q).

erwise clear documents, and if the pertinent provisions of contractual documents are unambiguous, the Court need not consider extrinsic evidence, but should at that point proceed to declare the meaning of those provisions; and (3) a document should be read as an integrated whole so that all of the provisions, if possible, will be given effect.

*Senn v. United Dominion* teaches that: (1) silence of the contractual documents concerning vestment of welfare benefits does not give rise to ambiguity warranting admission of extrinsic evidence but, rather, silence and explicit repudiation of vesting demonstrates that the parties did not intend vestment of lifetime right to benefits; and (2) the default rule in this circuit is that entitlements established by collective bargaining agreements do not survive the agreements' expiration or modification and, thus, it requires more than a statement in a bargaining agreement that welfare benefits "will continue" to create ambiguity about vesting, as the logical interpretation under the default rule is that benefits "will continue" for the duration of agreement.[9]

*Bidlack v. Wheelabrator* teaches that the default rule is not an "irrebuttable presumption," and where the collective bargaining agreement is vague, rather than silent on the subject of vesting, resort to extrinsic evidence is proper. However, if a preponderance of the evidence does not show that the parties intended the benefits to vest, the presumption is that they did not.

## ANALYSIS

Article XXIII, Section 23.0 of the 1990 CBA plainly and unambiguously states that the "Insurance and Health Care" agreement referenced therein "will remain in effect during the term of this agreement all as heretofore agreed upon and as revised." The plain meaning of this language is obvious: the parties were agreeing that during the term of the CBA, the health care plan would remain in effect. The use of the word "remain" implies a prior existence. The CBA says nothing about the status of the

plan after the CBA expired. Applying the default rule in this circuit (as stated in *Senn*), entitlement to health care benefits pursuant to the CBA did not survive the expiration of the term of the 1990 CBA which was May 30, 1993. Therefore, the 1986 Plan was no longer binding on Keystone after that date. The other language in Section 23.0 that "the language of such agreements is separate from and not a part of this agreement" arguably suggests that the 1986 plan preserved its separate identity, but did this language give the 1986 Plan an independent legal existence, binding upon Keystone, without regard to the 1990 CBA?

The 1986 Plan does not reference or mention any CBA. The 1986 Plan provides that a retiree's coverage terminates upon the date the Plan is terminated or amended to terminate the retiree's coverage. This language clearly and unambiguously indicates that the Plan can be terminated or amended to terminate a retiree's coverage, but the Plan is silent as to how such action is to be done, and who has the right to act in this regard. If the Plan itself can be terminated or amended to eliminate a retiree's coverage, then it logically follows that the provision of health care benefits for retirees cannot be a lifetime proposition. This conclusion is compelled by the plain reading of the language of the Plan.

In opposition, the Retirees point to other provisions of the 1986 Plan which, they argue, strongly suggest lifetime benefit language. They emphasize Section IV dealing with the effective dates of retirees' coverage and language that the coverage of a retiree continues until death.

## SECTION IV

## HOSPITAL, MEDICAL, AND SURGICAL BENEFITS

Medical benefits set out in this booklet are available to Company Employees who are employed by Keystone on or before May 2, 1984.

Employees who are first employed by the Company on or after May 3, 1984, are

---

9. On the other hand, rights which accrued or vested under a collective bargaining agreement will, as a general rule, survive termination. See *Bidlack*, 993 F.2d at 606.

eligible after they have worked 520 hours for different medical benefits and should contact the Company Insurance Department to obtain a description of these medical benefits.

## A. GENERAL INFORMATION

### EFFECTIVE—ACTIVE EMPLOYEES

#### Active Employees

Basic and Major Medical Expenses coverage is effective on the first day after an Employee has worked 520 hours of full-time employment, provided he is working on that date and has applied for the coverage and agreed to make the required contribution, if any. If not, coverage is effective on the day he returns to active work.

#### Dependents of Active Employees

When a Retiree who retired after May 1, 1972, with thirty (30) years or more of accumulated services dies, his spouse shall be eligible to receive continued Basic and Major Medical Benefits (for which the spouse is eligible as though the Retiree had survived) at no cost. Coverage shall cease when the spouse remarries.

When a Retiree who retired after August 1, 1975, with twenty (20) years or more of accumulated service dies, his spouse shall be eligible to receive continued Basic and Major Medical Benefits (for which the spouse is eligible as though the Retiree had survived) at no cost. Coverage shall cease when the spouse remarries.

### EFFECTIVE DATE—RETIREES

#### Retired Employees

Coverage is effective on the date an Employee retires under the Company's retirement plan. Provided, however, that an Employee who leaves the Company with a deferred vested pension and later retires under the Company's retirement plan shall not be eligible for Basic and Major Medical Benefits.

#### Dependents of Retired Employees

Coverage for Dependents of retired Employees become effective on the date the Employee's coverage is effective.

However, the 1986 Plan must be read as an integrated whole so that all of the provisions, if possible, will be given effect. *See Ryan v. Chromalloy,* 877 F.2d at 604. In doing so, the distinction must be kept in mind between a *non-terminable* plan, which may or may not provide lifetime health care benefits to retirees and their surviving spouses and eligible dependents, and a *terminable* plan which may or may not provide such lifetime health care benefits. Due to the fact that the 1986 Plan has a termination clause, it falls into the latter category. In that context, the question remains whether the language proffered by the Retirees indicates that (while the 1986 Plan is in effect) the benefits provided are lifetime in duration. In the Court's judgment, the proffered language is unambiguous: a retiree *is* provided lifetime coverage and coverage continues after his death for his spouse and eligible dependents so long as the 1986 Plan has not been terminated or amended prior to the occurrence of his death. Because the 1986 Plan is terminable, the Retirees are not entitled to have health care benefits continue after the proper termination or amendment of the 1986 Plan.

Having decided that the Retirees' benefits under the health insurance plan are not guaranteed for life, in the sense that they survive the termination of the 1986 Plan, (and before getting to the question of whether the 1986 Plan was properly terminated or amended for the Retirees), I am left with the suspicion that this issue of lifetime benefits is not and was not the crux of Plaintiffs' real complaint. In fact, Plaintiffs' counsel admitted during argument that their legal theory allowed them to accept the benefits of any favorable changes in the health care plan over the years since 1960 from collective bargaining but not unfavorable changes, a position made easier by the fact that he could not recall any unfavorable changes prior to the action by Keystone giving rise to the controversy at issue. It appears to the Court that this candor on behalf of Plaintiffs' counsel reveals their true complaint. The new Retirees' Plan treated them differently from active employees and other retirees over 65 years old to their financial detriment. As previously mentioned, the 1986 Plan provided the

same health care benefits for active employees and *all* retirees.[10]

Whether Keystone's unilateral acts constituted a breach of the contract documents requires the Court to identify who has the right to terminate or amend the 1986 Plan. If Keystone had the right, the ball game is over for the Retirees. The 1986 Plan document is silent on this issue, or in other words, does not expressly say. Keystone argues that the aforesaid 1986 Plan's provision for termination implicitly allows them to terminate or amend the Plan unilaterally. This is consistent with their theory that the plans are similar to a revocable trust wherein the settlor reserves the right to terminate or amend the trust. In counterpoint, Plaintiffs point to other Plan provisions dealing with the effective dates of retiree coverage and language that the coverage of a retiree continues until death as suggesting that the benefits are lifetime and therefore cannot be terminated unilaterally by Keystone. The Court fails to see the logic of this reasoning on the issue of right to terminate or amend.

The strongest case Plaintiffs make for a requirement of bilateral action is the argument that the various plans since 1966 have all been the product of an agreement between Keystone and the Union negotiated by the Joint Insurance Committee which was created by the 1966 CBA. Therefore, argues the Union, since the plans are agreements, they cannot be terminated or amended without the consent of the Union. In support of this theory, Plaintiffs point to the language in Article XXIII of the current CBA dated May 3, 1993 ("1993 CBA"), that the "company agrees that the ... [insurance and health care] *agreement*(s) will remain in effect during the term of this agreement *all as heretofore agreed upon and as revised.*" (emphasis added). This underlined language first appeared in the CBA dated February 4, 1966,[11] and the plain meaning suggests that the par-

ties considered that the insurance and health care plan was an agreement and was the product of previous · agreements between Keystone and the Union.

Also in the 1966 CBA a Joint Insurance Committee ("JIC") was first created which Plaintiffs claim was responsible for negotiating the health insurance plan with Keystone in succeeding years. Although there is no specific language in the 1966 CBA explicitly authorizing the JIC to "negotiate" the health care plan, the affidavits of John W. Gay and Art Hannon submitted in support of Plaintiffs' Motions for Summary Judgment state that this was one of the actual functions of the JIC. This is disputed by Keystone, but Keystone has failed to submit counter affidavits; instead Keystone has moved to strike the affidavits as irrelevant. That motion is hereby denied. The language creating the JIC follows:

> **23.214** IT IS HEREBY AGREED that a Joint Insurance Committee will be established as of the date of the signing of this Agreement in the following form and for the following purposes:
>
> > **23.2141** The Joint Insurance Committee shall be composed of three members from Management and three members from the Union, said members to serve five-year terms and to have the qualification of having knowledge and understanding of insurance benefit programs.
> >
> > **23.2142** The Joint Insurance Committee will meet in regular scheduled meetings and at such time and place as is agreed among its members, but in no event will the meetings be less often than semi-annually.
> >
> > **23.2143** The basic purposes and responsibilities of the Joint Insurance Committee will be

---

10. The Memorandum of Understanding: #11 relating to the CBA dated May 3, 1993, specifically states: "Those employees who retire on or after May 3, 1993, will be entitled to receive the same benefits on the same basis as active employees." (Ziegele Affidavit, Exh. V, Page 61).

11. The absence of this language in prior CBAs negotiated in 1960 and 1963 would arguably strengthen Plaintiffs' position. The odds in favor of Plaintiffs' view are further increased by the presence of language in other parts of these CBAs where other plans in existence, such as apprentice training, were specifically referred to as an "agreement with the Union." *See Appendix* at 36.

**23.21431** to consider ways to help Keystone employees better understand the insurance benefits available to them under the Keystone Insurance Plan; the rules and regulations enumerated thereunder; the methods of claim filing; and where insurance carriers are providing benefits, the rules and restrictions of the insurance contracts thereunder.

**23.21432** to review and make an earnest effort to resolve the problems arising under the administration of the Keystone Insurance Plan which lead to excessive cost factors to the Company and/or to complaints from the employees relative to the services rendered by the insurance carriers.

**23.21433** to review and make an earnest effort to resolve the specific claim problems relating to the individual status of claims when the following procedure has been first followed:

**23.214331** All claim problems and the individual status of claims must first be referred to the Company's Personnel Department who will investigate and attempt to resolve said problem.

**23.214332** If no solution is arrived at by the Personnel Department and the employee involved, a complaint embodying the facts of the case in writing can be referred to the Joint Insurance Committee at least 48 hours prior to a scheduled meeting of the Committee who will then review said problem.

**23.21434** Insurance claim problems, except life insurance claims, that are not resolved by the Joint Insurance Committee may be filed as a written grievance directly into Step III of the grievance procedure and into arbitration if required as defined in Article XVI.

As proof of the involvement of the JIC in negotiating the health care benefit plans with Keystone, the Union points to a language change in the CBA dated May 3, 1966, when referencing the health insurance plan. The word "the" was substituted for the possessive pronoun "its" in recognition that the health insurance plan had been transformed from Keystone's unilateral largess into a negotiated agreement.

The pertinent relevant language in the May 3, 1966, CBA and the preceding ones dated February 4, 1960, and February 4, 1963, follow:

**February 4, 1960, Agreement** (Ziegele Affidavit, Exh. A).

Article XVI at page 67 provided:

### PROFIT SHARING, RETIREMENT, INSURANCE AND SECURITY BENEFIT PLANS

The Company agrees to continue *its* present Profit Sharing Plan, *its* Pension and Retirement Plan, *its* Group Insurance Plan, and *its* present Security Benefit Plan during the term of this Agreement. (emphasis added).

**February 4, 1963, Agreement** (Ziegele Affidavit, Exh. B).

Article XXIII, Section 23.0 at page 78 provided:

### PROFIT SHARING, RETIREMENT, INSURANCE, AND SECURITY BENEFIT PLANS

**23.0** The Company agrees to continue *its* present Profit Sharing Plan, *its* revised Pension Plan, *its* Group Insurance Plan, and *its* Security Benefit Plan during the term of this Agreement. (emphasis added).

**May 3, 1966, Agreement** (Ziegele Affidavit, Exh. C).

Article XXIII, Section 23.0 at page 77 provided:

### PROFIT SHARING, RETIREMENT, INSURANCE, SECURITY BENEFIT PLANS AND MANDATORY VACATION PLANS

**23.0** The Company agrees to continue *its* present Profit Sharing Plan and *the* Pension Plan, *the* Group Insurance Plan, *the* Security Benefit Plan, and *the* Mandatory Vacation Plan all as heretofore agreed upon and as hereinafter agreed to be revised for the term of this Agreement. (emphasis added).

Upon close analysis, the Plaintiffs' focus upon the "agreement" status of the various health care benefit plans is all sound and fury without substance. Defendants have, more or less, admitted in their Answer to the Amended Complaint that these plans are "agreements" and constitute contracts between an employer and a labor organization within the meaning of Section 301 of the LMRA." (Answer to Amended Complaint, paras. 27–28). Regardless, the Court finds the conclusion compelling that beginning with the CBA dated May 3, 1966, the health care benefit plan developed by Keystone and maintained pursuant to the various CBAs took on the mantel of an agreement; and the JIC was utilized in negotiating and administering the various health care plans which were then placed in force by the CBAs.[12]

The critical question remains whether these agreements, which were activated by the CBA, continued as binding on Keystone after the expiration of the CBA. In deciding this question, we look to the CBA and the plan agreement.

The pertinent language of the CBAs is clear and unambiguous that the health care benefit plan remained in force *only* during the term of the CBA. *See* Appendix (quoting relevant language) at 1383–88. The remaining question is whether there is any language in the health care plans themselves which give them binding authority outside of the related CBA. The Court finds nothing in the 1986 Plan or in any prior health care plan to indicate the duration of the plan; the plans are silent on that subject, as distinct from the subject of duration of coverage on which the plans say a lot. Defendants refer back to the CBAs for the explication of the plan's duration, and Plaintiffs' focus upon the coverage language which they argue provide for lifetime benefits. This latter issue has already been discussed and decided *supra.* Needless to say, there is a difference between the coverage issue and the issue of the duration of the plan itself. In the presence of this silence and the absence of any vagueness and the specific termination reference in the 1990 CBA, the controlling Seventh Circuit precedents of *Ryan, Senn,* and *Bidlack* require the conclusion that the duration of the 1986 Plan was coextensive with the duration of the CBA pursuant to which the plan was maintained.

The inquiry does not end here, however, for the ERISA claim in Count II. ERISA has specific requirements for amending a plan. Section 402(b)(3), 29 U.S.C. § 1102(b)(3), requires that all employee benefit plans be in writing and "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." Admittedly, the 1986 Plan facially violates § 402(b)(3) because it does not set forth a procedure for amending the plan nor does it identify the person authorized to amend.

In reliance upon *Schoonejongen v. Curtiss–Wright Corp.,* 1993 WL 533734 (3rd Cir. 1993), *vacated, reh'g granted,* 18 F.3d 1034 (3rd Cir.1994).[13] Plaintiffs argue that the

12. In putting the puzzle pieces together for an understanding of the whole picture, one must rely on common sense interpretation of events and documents in the absence of evidence to the contrary. The foregoing Amendatory Agreement which specifically "continue[d] the insurance program until the expiration of the labor agreement dated February 1, 1963," was followed by the CBA dated May 3, 1966, which for the first time contained the language alluding to the health insurance plan as an agreement. Blend in the fact that this is the same CBA which created the Joint Insurance Committee, and the deduction is persuasive that by the time of (and perhaps partially as a result of) the CBA dated May 3, 1966, the health insurance plan had been transformed into an agreement between Keystone and the Union. If, in fact, the Joint Insurance Committee actually negotiated the various plans as part of its assigned duties, the puzzle is complete. On this point, there is a dispute of fact. The Union has submitted the affidavit of John W. Gay who says that he was a member of the Joint Insurance Committee from 1966 to 1982, that he "was directly involved in negotiation of the Plan Agreements," and "that Keystone always negotiated the Welfare Benefit Program with bargaining unit employees," and "always negotiated changes with the ISWA for the Keystone Steel & Wire Benefit Plan." The affidavit of Art Hannon was similar in all respects except Mr. Hannon does not say that he was a member of the Joint Insurance Committee, although at oral argument this omission was said to be an oversight.

13. On rehearing, the Third Circuit merely deleted its reference to ERISA's plan termination procedures, § 1341(b), because these procedures apply only to pension plans, not to welfare plans.

purported amendment by Keystone of the 1986 Plan to exclude coverage for the Retirees was ineffective because it was not made in conformity with an amendment procedure contained within the Plan as required by § 402(b)(3). Additionally or alternatively, Plaintiffs argue that even though the 1986 Plan does not specify the actual steps for amending, historically· the plans and collective bargaining agreements together set up a clearly intended manner of amending any changes in the health care plans which require bilateral action by Keystone and the Union. Specifically, Plaintiffs argue that since 1966, the health benefit plans were established by agreement, and the creation and operation of the Joint Insurance Committee (JIC) culminating in the CBA constituted the exclusive amendment procedure; and since the language creating the JIC identifies the names of the members of the JIC, § 402(b)(3) requirements are met. Therefore, Plaintiffs conclude that the 1986 Plan could not be unilaterally amended by Keystone, but rather only by bilateral agreement with the Union. The problem with this argument is that it defeats itself since the CBAs which activate the various plans explicitly state that the plans terminate when the CBA terminates.

■ In support of its action amending the 1986 Plan, Keystone argues that explicit statements in the Plan give Keystone the inherent right to amend or terminate the Plan. Keystone analogizes its situation to that of a trust settlor who has reserved the power to amend but not provided a method of exercising it. *See Biggers v. Wittik Industries, Inc.,* 4 F.3d 291 (4th Cir.1993). Under principles of trust law, a settlor's intention to reserve a power of revocation need not be manifested by an express provision to that effect; it can be indicated by the use of language from which the power may be inferred. Keystone argues that the language of the 1986 Plan, by providing for termination, impliedly gives Keystone, the person putting up the money, the right to amend the

plan from time to time since the plan beneficiaries have no vested rights under ERISA or the CBA to plan benefits. The Court agrees with Keystone in that regard.

■ The question remains, however, whether Keystone properly amended the 1986 Plan as required by ERISA. *Biggers* held that in the absence of provisions in a plan that provide procedures for amendment, a writing amends a plan only when accompanied by a clear manifestation of an intent to alter the policy or plan. *Biggers,* 4 F.3d at 295. Unquestionably, Keystone's actions met this standard. On February 1, 1993, pursuant to authority delegated by the Board of Directors, Glenn R. Simmons, Chairman and Chief Executive Officer of Keystone, terminated coverage for the Retirees under the 1986 Plan and established a new plan for them. On February 24, 1993, Simmons gave notice to the Retirees of these changes in health benefits to become effective July 1, 1993. This notice was followed up with further explanation of the changes on March 25, 1993; June 9, 1993; June 15, 1993; and July 28, 1993.

Section 402(b)(3), however, requires that the plan document provide a procedure for amending and identify the persons authorized to amend. Some courts have held that the failure to comply with § 402(b)(3) invalidates any purported amendment. *See Schoonejongen v. Curtiss–Wright Corp.,* 1993 WL 533734 (3rd Cir.1993), *vacated, reh'g granted,* 18 F.3d 1034 (3rd Cir.1994). In *Curtiss–Wright,* trust law principles were applied in finding that the employer had reserved the right to amend the employee benefit plan to terminate benefits for retired employees but had violated ERISA § 402(b)(3) by failing to include an amendment procedure among the plan's provisions. The Third Circuit held that the lack of an expressed amendment procedure rendered invalid a purported amendment authorizing termination of the retirees' benefits.[14]

14. As pointed out in *Curtiss–Wright,* failure to comply with § 402(b)(3) does not forever foreclose the employer from effectively utilizing its reserved power to amend or terminate a plan. The congressional scheme embodied in ERISA will be best served by a rule that an amendment designed solely to bring a plan into compliance with § 402(b)(3) can be effectively adopted by formal action of those who possess the sponsor's final management authority.

If *Curtiss–Wright* is persuasive precedent in this circuit, Keystone must lose since, admittedly, the 1986 Plan does not contain any amendment procedures. Keystone seeks to avoid the unfavorable effect of the holding in *Curtiss–Wright* by arguing that the Seventh Circuit takes a more charitable view of failure to comply with procedural requirements of ERISA, and that purported amendments will not be invalidated absent evidence of bad faith, active concealment, or unfair administration. *See Kreutzer v. A.O. Smith Corp.*, 951 F.2d 739 (7th Cir.1991); *Hamilton v. Ontario Forge Corp.*, 794 F.Supp. 291 (S.D.Ind.1992). However, the cases cited by Keystone in support of this proposition have questionable utility. Unlike the facts of our case, none of them involved the failure of an employer to comply with the procedural requirements of § 402(b)(3) in amending an employee welfare plan.

In *Kreutzer*, former employees were denied severance pay benefits under a favorable plan provision which, unbeknownst to them, had been superseded by a less favorable formula for calculating severance pay benefits by an amendment to the plan made by the employer without notice to the employees and in context of a wholesale lack of compliance with ERISA's reporting and plan summary provisions by the employer. *See* 29 U.S.C. §§ 1021–1031. Specifically, the employer had failed to provide participants with the required five and ten year plan summaries and had failed to make the necessary periodic filings with the Secretary of Labor required by 29 U.S.C. § 1024. The Seventh Circuit considered these ERISA violations to be "technical" and, standing alone, insufficient to provide any relief to the employees, absent a showing that the employer had acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced the employees by inducing their reliance on a faulty plan summary.

The fact that A.O. Smith technically violated ERISA does not help the employees in this case. An employer's procedural violations of ERISA entitle employees to monetary relief only in exceptional cases. *See Berger v. Edgewater Steel Co.*, 911 F.2d 911, 920–21 (3d Cir.1990); *Wolfe v. J.C. Penney Co., Inc.*, 710 F.2d 388, 393

(7th Cir.1983). Most courts that have considered the issue have held that the employer must have acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced their employees by inducing their reliance on a faulty plan summary before recovery for procedural violations is warranted. *See Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985) (active concealment); *Govoni v. Bricklayers, Masons & Plasterers*, 732 F.2d 250, 252 (1st Cir.1984) (collecting cases requiring reliance and prejudice).

*Kreutzer*, 951 F.2d at 743.

In *Hamilton v. Ontario Forge Corp.*, 794 F.Supp. 291 (S.D.Ind.1992), another case where severance pay benefits were denied, the district court followed *Kreutzer* in holding that absent any allegations or evidence of "bad faith, active concealment, or unfair administration," the employer's failure to comply with ERISA's reporting requirements in administering its severance pay plan would not give rise to a substantive remedy under ERISA. As stated in *Hamilton*, "an employer's failure to comply with an ERISA procedural requirement entitles an employee to monetary relief only in 'exceptional cases;' to recover for a procedural violation, the plaintiff must produce evidence of bad faith, active concealment, or unfair administration." *Id.* at 296.

Defendant does not cite, and the Court's research has failed to discover, any Seventh Circuit case dealing specifically with the application of the procedural amendment requirements of § 402(b)(3) to a plan void of any amending procedure. The closest case is *Albedyll v. Wisconsin Porcelain Co. Rev. Ret. Plan*, 947 F.2d 246 (7th Cir.1991). *Wisconsin Porcelain Co.* involved a fact situation where, contrary to the procedure established in the partnership's pension plan, the plan was improperly amended to allow reversion of surplus funds to the partnership upon termination of the plan, to the detriment of plan participants and beneficiaries. The district court found the reversion amendment invalid because it was not made in conformity with the plan's explicit requirement that all

partners must approve all amendments and "violated ERISA's requirement that a qualified plan have a specific amendment procedure. 29 U.S.C. § 1102(b)(3)." *Id.* at 250–251. The partnership argued that the amendment was valid because it "effected no substantive harm." The Seventh Circuit recognized that it, together with other circuits, have "held that remedies available under ERISA are sometimes limited by the type of violation by administrators." *Id.* 947 F.2d at 255. (citations omitted).

In particular, the Seventh Circuit cited *Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 949 (6th Cir.1990), where a written plan amendment abrogating an unwritten severance pay provision was permitted even though the plan did not include a specific amendment procedure as ERISA requires. The amendment was allowed in part on the basis that administrators owed no fiduciary duty to participants in terminating or amending a welfare benefit plan. The more pertinent reason, for our purposes, was the Sixth Circuit's belief that "Congress [had not] intended that any plan failing to comply with § 1102(b) would, for that reason alone, become unamendable."

Plaintiffs in the case at bar have failed to show any detrimental reliance based on the Defendant's failure to comply with § 1102(b), and, under these circumstances, the Court declines to impose the substantive remedy of prohibiting plan amendments in response to Defendant's procedural violations. In invalidating the reversion amendment in *Wisconsin Porcelain Co.,* the Seventh Circuit distinguished *Adams* and the other cited cases where improper plan amendments "effected no substantive harm:"

> These cases are distinguishable because the WPC plan contained an explicit amendment procedure, the participants were harmed by its violation and ERISA and trust law provide a remedy. The loss of the surplus benefits is clearly a substantive harm, and claimants appear not even to have received notice. ERISA authorizes suits in a situation where participants or beneficiaries seek benefits due or enforcement or clarification of rights under a plan. 29 U.S.C. § 1132(a)(1)(B). ERISA also authorizes beneficiaries or fiduciaries to bring an action enjoining any act or practice violating ERISA or plan terms, or enforcing the provisions of ERISA or plan terms. 29 U.S.C. § 1132(a)(3). These provisions allowed participants to seek invalidation of the provision. Once the violation is established, beneficiaries are entitled to recovery of the surplus under either the terms of the Prior Plan or under ERISA's provision that surplus assets go to beneficiaries in the absence of an explicit provision to the contrary. 29 U.S.C. § 1103(c)(1), 1344(d)(1); 29 C.F.R. § 2618.-30(b). The substantive remedy sought here is therefore provided by ERISA and trust law.

*Wisconsin Porcelain Co.,* 947 F.2d at 246.

When all is said and done, I am left with the daunting task of anticipating the decision of the Seventh Circuit when faced with the specific issue at hand. In the absence of any amendment procedures in the 1986 Plan as required by ERISA, 29 U.S.C. § 1102(b)(3), was the purported amendment and the concomitant establishment of the Retirees New Plan valid under ERISA? In the Court's judgment, the Seventh Circuit would cast its lot with the philosophy of the Sixth Circuit in *Adams v. Avondale Industries, Inc.,* and the Fourth Circuit in *Biggers v. Wittik Industries, Inc.,* rather than the Third Circuit in *Schoonejongen v. Curtiss–Wright.*

There is no allegation or evidence in the record that the lack of an amendment procedure was done in bad faith, was actively concealed, or administered unfairly. The absence of any amendment procedures have been facially evident since the health care plan first began acting as the Summary Plan Description for ERISA purposes in 1985 and was available to the Retirees. Additionally, there is no allegation or evidence of any detrimental reliance by Defendants based upon Keystone's failure to comply with 29 U.S.C. § 1102(b)(3). Keystone gave Plaintiffs notice of the planned amendment in February 1993, when it announced that the amendment would not take effect until July 1993, after the expiration of the then current CBA and the health care plan established thereunder. Further, Keystone's February

notice, in effect, gave Plaintiffs the same "warning" that compliance with an amendment procedure satisfying ERISA would have given them. The Court does not perceive any substantive harm to Defendants which exists by reason of Keystone's failure to' comply with 29 U.S.C. § 1102(b)(3) as distinct from the harm resulting from the amendment itself. Finally, pursuant to the principles of trust law as discussed in *Wittek Industries*, 4 F.3d at 294–295:

> The 1987 policy of Wittek Industries does not ... provide amendment procedures or designate persons authorized to amend it. We are therefore left with an employee welfare benefit plan that, although it may be terminated or amended, provides no mechanism or standard for doing so, as required by 29 U.S.C. § 1102(b)(3).... [W]e remain in need of a standard for considering whether the 1989 amendment was effectively adopted when it was drafted and filed but not approved and signed by Wittek's president.

As is often the case in considering issues under ERISA, when they are not covered explicitly by the Act, we find guidance in the principles of trust law. [citation omitted]. A situation much like the one now before us occurs in trust law when a settlor reserves the power to modify or revoke a trust, but fails to specify a method for implementing changes. If such power is reserved, then the settlor may exercise the power in any manner that 'sufficiently manifests his intention to modify the trust.' Restatement (Second) of Trusts § 331 cmt. c. The settlor must indicate that he has reached a 'definitive decision' to alter the trust, and is not just contemplating taking some action in the future. *Id.* § 330 cmt. i; *see also Deibler v. United Food and Commercial Workers, Local Union 23,* 973 F.2d 206, 210 (3rd Cir.1992) (relying on trust law principles and stating that a benefit plan may be amended only through manifestation of an intent to alter).

*Because the power to revoke or amend an employee welfare benefit plan is inher-*

*ently reserved to the employer under ERISA, an employer who fails to include procedures in its plan for amendment is in the same position as the settlor who has reserved the power to amend but not provided a method for exercising it.* The trust law standard for determining whether an amendment has been made is thus appropriate for determining whether an employer has formally amended an employee welfare benefit plan covered by ERISA. Accordingly, *we hold that in the absence of provisions in a plan that provide procedures for amendment, a writing amends a plan only when accompanied by a clear manifestation of an intent to alter the policy or plan.*[15]

### CONCLUSION

All the pieces of the interpretation puzzle are now together. Having decided that the 1986 Plan did not survive the expiration of the 1990 CBA, the 1986 Plan was no longer binding on Keystone, *see Senn,* 951 F.2d at 814, and Keystone was free to continue the coverage for Retirees in connection with the CBA dated May 3, 1993, or was free to change the Retirees' coverage, which it did. *See also Senn,* 951 F.2d at 814. As stated by the dissent in *Bidlack:*

> Labor law supplies a benchmark: employers may change terms on the expiration of an agreement (and sometimes during its course) unless they explicitly surrender that entitlement.

993 F.2d at 620.

The Court finds that the previously discussed language of the contractual documents is unambiguous in limiting the viability of the health care benefit plans, including the 1986 Plan, to the term of the respective CBAs. There being no ambiguity, the extrinsic evidence offered by Plaintiffs of the exit documents promising so-called "lifetime" health care benefits to retiring employees are

---

**15.** As pointed out in *Biggers,* 4 F.3d at 291 n. 1, despite this holding, since the inclusion of procedures for amending a plan are statutorily required, not only may the requirement be en-

forced by suit pursuant to 29 U.S.C. § 1132, but failure to include the mandated procedures may, in other circumstances, affect the validity of the amendment as mentioned *supra.*

irrelevant.[16] This determination is consistent with *Ryan* and *Senn* where no ambiguity was found; and also consistent with *Bidlack* where ambiguity was found.

The operative facts of our case are critically different from the facts of *Bidlack* in two significant respects. Unlike *Bidlack*, our contractual documents contain a termination clause where it is explicitly stated that the Retirees' health care benefits "terminate upon the date the Plan is terminated or amended to terminate a retiree's coverage." Additionally, unlike the case in *Bidlack* where the Appellate Court found the collectible bargaining agreements "vague" on the issue of duration of health care benefits, the contractual documents in our case are not vague in explicitly stating that the health care benefits terminate upon expiration of the CBA. Our facts are more similar to those of *Ryan* and *Senn* where the contractual documents explicitly provided for right to terminate or amend the benefits program or plan. In *Ryan*, each of the relevant documents contained "either an express termination clause or reference to the Division's right to terminate the entire program." *Ryan*, 877 F.2d at 600. In *Senn*, the Group Benefits Booklet issued during the term of the collective bargaining agreement "specifically provided that insurance benefits would end upon either the termination of the employer's welfare benefit plan or the expiration of the Collective Bargaining Agreement," and the language in the final Collective Bargaining Agreement provided that coverage for retirees shall be continued "during the term of this Agreement." *Senn*, 951 F.2d at 815.

The ERISA claim in Count III must also fail. Although 29 U.S.C. § 1102(b)(3) was violated, Plaintiffs cannot show any detrimental reliance warranting a substantive remedy under ERISA. This is not to say that Plaintiffs cannot force Keystone to bring its plan into conformity with ERISA requirements in that regard.

In summary, the health care benefits provided the Retirees in the 1986 Plan maintained pursuant to the CBA dated May 3, 1990, did not vest, and Keystone was not obligated to continue those benefits beyond the expiration of the CBA. Therefore, Keystone did not breach the CBA under the LMRA or violate ERISA. ACCORDINGLY, Plaintiffs' Motions for Summary Judgment as to Count II (# 26–1) and Count III (# 22–1) of the Amended Complaint are **DENIED,** and Defendants' Motion for Summary Judgment on all counts (# 12–1) is **ALLOWED.** IT IS FURTHER ORDERED that Keystone's Motion to Strike Plaintiffs' Affidavits of Art Hannon and John Gay (# 25) is **DENIED,** except with reference to paragraph 5 and 7. Keystone's Motion to Strike Plaintiffs' Affidavit of Harold Kauffman (# 37–1) is **DENIED,** except paragraphs 4, 5, 7, and 8 are stricken and the remaining paragraphs are accepted without the reference to the Retirees. Plaintiffs' Motion to Strike in part the Second Supplemental Affidavit of Jon Ziegele (# 35–1) is **ALLOWED** as to paragraphs 4, 6, 7, 8, 9 and 10. Keystone's Motion for an order pursuant to Local Rule 2.9(E) (# 21–1) is **ALLOWED.** Each party is to bear their own costs. The Clerk of the Court is directed to enter final judgment. **CASE TERMINATED.**

### *APPENDIX*

1. **February 4, 1960 Agreement** (Ziegele Affidavit, Exhibit A).

*Article XVI* at page 67 provided:

## PROFIT SHARING, RETIREMENT, INSURANCE, AND SECURITY BENEFIT PLANS

The Company agrees to continue its present Profit Sharing Plan, its Pension and

---

16. In connection with the required "Application for Pension" form completed by a retiring employee, an employee was given a document which stated under the heading *Medical and Hospitalization Insurance* the following language:

Coverage remains the same until age 65 at which time you are eligible for Medicare and *must* apply for Part A and B to qualify for reimbursement.

(or in some cases)

Coverage remains the same at no cost to retirees until age 65 at which time you are eligible for Medicare.

Retirement Plan, its Groups Insurance Plan, and its present Security Benefit Plan *during the term of this Agreement.* (emphasis added).

*Article XIX,* Section A at page 68 provided:

### TERM OF AGREEMENT

**A. Term.** This Agreement shall be in full force and effect for three (3) years from the date hereof and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof.

2. **February 4, 1963 Agreement** (Ziegele Affidavit, Exhibit B).

*Article XXIII,* Section 23.0 at page 78 provided:

### PROFIT SHARING, RETIREMENT, INSURANCE, AND SECURITY BENEFIT PLANS

**23.0** The Company agrees to continue its present Profit Sharing Plan, its revised Pension Plan, its Group Insurance Plan, and its Security Benefit Plan *during the term of this Agreement.* (emphasis added).

*Article XXVI,* Section 26.0 at page 79 provided:

### TERM OF AGREEMENT

**26.0 Term.** This Agreement shall be in full force and effect for three (3) years from February 4, 1963, and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof.

3. **May 3, 1966 Agreement** (Ziegele Affidavit, Exhibit C).

### PROFIT SHARING, RETIREMENT, INSURANCE, SECURITY BENEFIT PLANS AND MANDATORY VACATION PLANS

**23.0** The Company agrees to continue its present Profit Sharing Plan and the Pen-

sion Plan, the Group Insurance Plan, the Security Benefit Plan, and the Mandatory Vacation Plan all as heretofore agreed upon and as hereinafter agreed to be revised *for the term of this Agreement.* (emphasis added).

*Article XXVI,* Section 26.0 at page 88 provided:

### TERM OF AGREEMENT

**26.0 Term.** This Agreement shall be in full force and effect for three (3) years from May 3, 1966, and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof.

4. **June 8, 1969 Agreement** (Ziegele Affidavit, Exhibit D).

*Article XXIII,* Section 23.0 at page 78 provided:

### PROFIT SHARING, RETIREMENT, INSURANCE, SECURITY BENEFIT PLANS AND MANDATORY VACATION PLANS

**23.0** The Company agrees to continue its present Profit Sharing Plan and the Pension Plan, the Group Insurance Plan, the Security Benefit Plan, and the Mandatory Vacation Plan all as heretofore agreed upon and as hereinafter agreed to be revised *for the term of this Agreement.* (emphasis added).

*Article XXVI,* Section 26.0 at page 85 provided:

### TERM OF AGREEMENT

**26.0. Term.** This Agreement shall be in full force and effect **until 12.01 a.m. May 3, 1972,** and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof.

5. **May 3, 1972 Agreement** (Ziegele Affidavit, Exhibit E).

*Article XXIV*, Section 24.0 at pages 84–85 provided:

24.0 The Company agrees that the following agreements will remain in effect *during the term of this agreement* all as heretofore agreed upon and as revised: (emphasis added)

Pension

Insurance and health care

Security Benefit

M.V.P. (until Dec. 31, 1972)

Apprenticeship

Incentive Study (11–4–70)

Profit Sharing (1960) or

(The language of such agreements is separate from and not a part of this agreement).

*Article XXVI*, Section 26.0 at page 85 provided:

### TERM OF AGREEMENT

26.0 **Term.** This Agreement shall be in full force and effect **until 12.01 a.m. May 3, 1975,** and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof.

6. **May 3, 1972 "1975 Revision" Agreement** (Ziegele Affidavit, Exhibit F).

*Article XXIV*, Section 24.0 at page 88 provided:

### AGREEMENTS

24.0 The Company agrees that the following agreements will remain in effect *during the term of this agreement* all as heretofore agreed upon and as revised: (emphasis added)

Pension

Insurance and health care

Security Benefit

Apprentice

Incentive Study (11–4–70)

Profit Sharing (1960)

(The language of such agreements is separate from and not a part of this agreement).

*Article XXVI*, Section 26.0 at page 88 provided:

### TERM OF AGREEMENT

26.0. **Term.** This Agreement shall be in full force and effect **until 12.01 a.m. May 3, 1975,** and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof. (Refer also to Keystone and I.S.W.A. Experimental Negotiating Agreement dated April 15, 1975).

7. **May 3, 1983 Agreement** (Ziegele Affidavit, Exhibit G).

*Article XXIV*, Section 24.0 provided:

24.0 The Company agrees that the following agreements will remain in effect *during the term of this agreement* all as heretofore agreed upon and as revised: (emphasis added)

Pension

Insurance and health care

"Thrift Plan"

Apprentice

Incentive Study (11–4–70)

Profit Sharing (May 3, 1982)

(The language of such agreements is separate from and not a part of this agreement).

*Article XXVI*, Section 26.0 provided:

### TERM OF AGREEMENT

26.0. **Term.** This Agreement shall be in full force and effect **until 12.01 a.m. May 3, 1984,** and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof.

8. **May 3, 1984 Agreement** (Ziegele Affidavit, Exhibit H).

*Article XXIV*, Section 24.0 at page 67 provided:

## AGREEMENTS

**24.0** The Company agrees that the following agreements will remain in effect *during the term of this agreement* all as heretofore agreed upon and as revised: (emphasis added)

Pension

Insurance and health care

"Thrift Plan"

Apprentice

Incentive Study (11–4–70)

Profit Sharing (May 3, 1984)

(The language of such agreements is separate from and not a part of this agreement).

*Article XXVI,* Section 26.0 at page 67 provided:

## TERM OF AGREEMENT

**26.0. Term.** This Agreement shall be in full force and effect **until 12.01 a.m. May 3, 1987,** and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof.

9. Keystone and I.S.W.A. Contract Extension Agreement dated June 20, 1986 (Ziegele Affidavit Exhibit I) extended the May 3, 1984, agreement (with certain modifications not pertinent to this case) to May 3, 1990.

10. **May 3, 1990 Agreement** (Ziegele Affidavit, Exhibit J).

*Article XXIII,* Section 23.0 at page 71 provided:

**23.0** The Company agrees that the following agreements will remain in effect *during the term of this agreement* all as heretofore agreed upon and as revised: (emphasis added)

Pension

Insurance and health care

"Thrift Plan"

Apprentice

Incentive Study (11–4–70)

Profit Sharing (5–3–90)

Supplementary Agreement pertaining to the Company's South Complex until January 1, 1992.

(The language of such agreements is separate from and not a part of this agreement.)

*Article XXV,* Section 25.0 at page 72 provided:

## TERM OF AGREEMENT

**25.0. Term.** This Agreement shall be in full force and effect until 12.01 a.m. May 3, 1993, and thereafter from year to year unless sixty (60) days prior to the date of expiration either party notifies the other, in writing, of a desire to change the Agreement or any provision thereof.

The Memorandum of Understanding of the various CBAs expressly limited changes in the health care benefit plans to the term of the CBAs. For example, the May 3, 1963, CBA, Memorandum of Understanding: #11 stated:

**Hospital, Medical, Surgical and Major Medical**

The parties *agree to the following changes for the term of this agreement.* (emphasis added).

* Out–Patient, 2nd Surgical, PA (Pre Admission Testing), Utilization Review.

* Convert "floating" deductible (3 month carryover).

* Subrogation.

* Retiree Working Elsewhere—KSW Secondary.

* Non–PPA active employees continue to pay $15 per month.

* Hospice, Generic Drug, HMO (Health Maintenance Organizations), PPO (Preferred Provider Organizations) are a part of the plan but are voluntary.

* New hires on or after May 3, 1984, Medical—Comprehensive—$350 Deductible, 75/25 to $5,000—100% over $5,000, $500,000 Life Time Maximum.

* Medicare reimbursement to be increased $10.00 effective May 3, 1991,

and an additional $10.00 or full, whichever is less effective May 3, 1992.

* Detail of the above provisions will be included in the "Health Care" booklet.

* Sickness and Accident weekly benefits to be increased effective May 3, 1990, to $225.00 per week. Effective September 1, 1991, shall be increased to $250.00 per week and effective September 1, 1992, shall be increased to $300.00 per week.

Memorandum of Understanding: #12 of the May 3, 1984 CBA stated:

## Memorandum of Understanding: #12

## Hospital, Medical, Surgical and Major Medical

The parties *agree to the following changes for the term of this agreement.* (emphasis added).

* Out–Patient, 2nd Surgical, PAT (Pre–Admission Testing), MSA (Medical Services Advisor), Utilization Review.

* Convert "Floating" Deductible (3 Month Carryover).

* Subrogation

* Retiree Working Elsewhere—KSW Secondary

* Retirees without Medicare pay $5 per month is eliminated. (Note: Active employees continue to pay $15 per month.)

* Hospice, Generic Drug, HMO (Health Maintenance Organizations), PPO (Preferred Provider Organizations), and In–House Medical are a part of the Plan but are voluntary.

* New hires on or after May 3, 1984, Medical—Comprehensive—$350 Deductible, 75/25 to $5,000—100% over $5,000, $500,000 Life Time Maximum.

* Detail of the above provisions will be included in the "Health Care" booklet.

The Memorandum of Understanding: #12 of the May 3, 1982 CBA stated:

## Hospital, Medical, Surgical and Major Medical

The parties *agree to the following changes for the term of the agreement:* (emphasis added)

* Active employees pay $15.00 per month

* Retirees without Medicare pay $5.00 per month

* Retirees with Medicare pay $0.00 per month

* Surviving spouses of Retirees pay $0.00 per month

* Vision and Dental care plans are discontinued

* Major Medical, $100.00 deductible per person and $150.00 per family

* Option for employees are retirees to purchase Dental and Vision coverage.

There was no Memorandum of Understanding in 1963, however, the CBA dated February 4, 1963, was reopened for further wage negotiations on August 1, 1963, and an Amendatory Agreement executed which, among other things, amended "the Company's Insurance Plan ... in accordance with Attachment No. 1" which stated:

## ATTACHMENT No. 1

### INSURANCE

Effective August 1, 1963, improve and extend insurance program for employees actively at work on or after August 1, 1963, as follows:

1. Change the provision for maximum duration of hospitalization benefits for employees and their dependents from 120 to 365 days for hospital confinements commencing on or after August 1, 1963.

2. Increase the schedule for weekly sickness and accident benefits by $10.00 for employees earning $95 or more for forty hours the last full week worked, by $5 for employees earning less than $95 for forty hours the last full week worked.

3. Increase the schedule for basic life insurance for active employees by $500.

4. Reword maternity coverage in insurance plan to provide: "Maternity coverage is available for wife of an employee for any pregnancy which begins after the mother becomes enrolled under this

program provided coverage is in effect at the time of delivery."

5. Any claims for diagnostic services questioned by Blue Cross under Paragraph 18 of the benefits for bed patients shall be paid when confirmed in writing by the attending physician that the diagnostic services were necessary to or related to a condition which of itself required hospital bed care. It is understood that hospital admission solely for x-ray, laboratory services, electrocardiogram examinations, basal metabolism examinations, or physical therapy not incidental to necessary bed care required at the time of admission is not included in the Blue Cross Plan for Hospital Care provided by the Keystone Insurance Plan.

6. Effective the Monday after signing of this agreement, payment for sickness and accident claims causing loss of time from employment shall begin on the fourth day of disability and no allotment for the first three days' disability will be paid on any claim regardless of how long the disability exists. We will continue to provide payment for disability arising from accidents within the Keystone plant beginning on the first day of such disability.

7. *Continue the insurance program until the expiration of the labor agreement dated February 1, 1963.* (emphasis added).

### Article XXIV

### Apprentice Training

24.0 The Company agrees to continue its agreement with the Union relating to apprenticeship training during the term of the agreement.

Likewise, in the CBA dated February 4, 1960, similar language appeared:

The Company agrees to continue its current agreement with the Union relating to apprenticeship training during the term of this Agreement.

This language clearly acknowledges that Keystone has an agreement with the Union respect to apprenticeship training. Had there been an agreement with the Union in 1960 relating to the health insurance, it would have been very easy for the parties to be explicit in that regard.